UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL & ALLIANCE FOR THE WILD ROCKIES,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>UNITED STATES FOREST SERVICE, acting by and through Ashton/Island Park District Ranger on the Caribou-Targhee National Forest ELIZABETH DAVEY, HARV FORSGREN, Regional Forester for Region 4 of the Unites States Forest Service, KEN SALAZAR, United States Secretary of the Interior, and UNITED STATES FISH AND WILDLIFE SERVICE, acting by and through Director DAN ASHE,<br><br>　　　　　Defendants. | Case No. 4:11-cv-00212-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

On May 11, 2011, Native Ecosystems Council and the Alliance for the Wild

Rockies ("Plaintiffs") – non-profit organizations dedicated to the conservation and

preservation of natural resources and biodiversity in the Northern Rockies – filed an

action against the United States Forest Service, the United States Fish and Wildlife

**MEMORANDUM DECISION AND ORDER - 1**

Service, Secretary of the Interior Ken Salazar, and various other federal employees associated with these agencies (collectively "Defendants").[1] (Dkt. 1.)

In their complaint, Plaintiffs challenge the Forest Service's approval of the remapping of habitat for the Canada Lynx within the Caribou-Targhee National Forest and the authorization of the Split Creek Pre-Commercial Thinning Project, which provides for the thinning of approximately 7,000 acres of lodgepole pine located within the Island Park Subsection of the Caribou-Targhee National Forest in areas previously designated as protected lynx habitat. Plaintiffs seek judicial review of the above two actions under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and allege violations of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*

Before the Court is Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order. (Dkt. 25.) Plaintiffs seek an order enjoining all activities authorized by the Split Creek Pre-Commercial Thinning Project, including the thinning of approximately 2,400 acres of lodgepole pine scheduled to commence on August 23, 2011. The Court has reviewed Plaintiffs' motion, the parties' memoranda and supplemental materials filed in support of the parties' positions, and the Court heard oral arguments on

---

[1] Plaintiffs also name Elizabeth Davey (the Ashton/Island Park District Ranger for the Caribou-Targhee National Forest), Harv Forsgren (the Regional Forester for Region 4 of the United States Forest Service), and Rowan Gould (the Acting Director of the United States Fish and Wildlife Service). Plaintiffs' Amended Complaint (Dkt. 19) names Dan Ashe (the Director of the Fish and Wildlife Service) in place of Rowan Gould.

**MEMORANDUM DECISION AND ORDER - 2**

the motion on September 6, 2011.  Because the Court finds Plaintiffs have failed to

demonstrate a likelihood of irreparable harm, the motion for a preliminary injunction will

be denied as explained more fully in this order.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.  Designation of the Canada Lynx as a Threatened Species and Mapping of Lynx Habitat**

The Fish and Wildlife Service listed the Canada Lynx as a threatened species

under the ESA in March of 2000.  Following the designation of the lynx as endangered

under the ESA, an interagency lynx biology team developed the Canada Lynx

Conservation and Assessment Strategy ("LCAS") as an interim strategy for protecting

lynx on federal lands.  The LCAS provided direction for mapping lynx habitat and

recommended that each National Forest designate Lynx Analysis Units ("LAU's") for all

areas with lynx habitat. *Id.*  According to the LCAS, LAU's were "not intended to depict

actual lynx home ranges, but are intended to provide analysis units of the appropriate

scale with which to begin the analysis of potential direct and indirect effects of projects or

activities on individual lynx, and to monitor habitat changes." *Id.*  The LCAS also

provided planning standards and guidelines for delineating LAU's.

The LCAS defined lynx habitat as "mesic coniferous forests that have cold, snowy

winters and provide a pray base of snowshoe hare." Canada Lynx Conservation

Assessment and Strategy, Executive Summary, *available at*

http://www.fs.fed.us/r1/wildlife/carnivore/Lynx/lcas.pdf.  The LCAS also noted that the

**MEMORANDUM DECISION AND ORDER - 3**

snowshoe hare is the primary prey of the lynx, comprising up to 97 percent of the lynx's diet, and that the habitat of the lynx coincides with that of the snowshoe hare. *Id.*

Lynx habitat mapping and designation of LAU's within the Caribou-Targhee National Forest (the "Forest") was completed in 2001.  The 2001 map depicts several LAU's within the Forest.  The Forest Service and Fish and Wildlife Service entered into a Lynx Conservation Agreement in 2000.  The agreement served as a framework for lynx conservation within mapped lynx habitat on national forests.  The Lynx Conservation Agreement was revised in 2005 and again in 2006 to implement the standards and guidelines in the LCAS until formal management could be implemented.  The 2005 revisions noted that conservation measures detailed in the Agreement would apply only to National Forest lands mapped as "occupied lynx habitat" and that the Forest Service and Fish and Wildlife Service would jointly refine the criteria for classifying lynx habitat as occupied.[2]  "As new information became available (including information on habitat quality, snowshoe hare studies, and habitat mapping), it became necessary to refine the [original] LAU map," and in 2005, the Forest Service developed a revised LAU map for the Island Park and Centennial Mountain area.[3]

---

[2]  The 2005 Agreement is *available at* http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/53790_FSPLT1_019641.pdf.

[3]  Fish and Wildlife Service's Concurrence with the Forest Service's determination of the effects on listed species for the proposed Split Creek Precommercial Thinning Project, dated August 11, 2009.  This document was submitted by the Defendants as part of the Administrative Record ("AR"). (AR 35.)  All further citations to documents contained in the Administrative Record will be referenced by the document title, if pertinent, and the "AR" number.

**MEMORANDUM DECISION AND ORDER - 4**

The 2005 map identified lynx habitat and designated LAU's using the habitat

descriptions from the LCAS.  Linkage areas (defined as areas that provide connectivity

between blocks of lynx habitat) were also identified. The 2006 revisions included the

following definition of "occupied lynx habitat":

> All mapped lynx habitat on an entire forest is considered
> "occupied" by lynx when:
>
> - [t]here are at least 2 verified lynx observations
>   or records since 1999 on the national forest
>   unless they are verified to be transient
>   individuals; or
>
> - [t]here is evidence of lynx reproduction on the
>   national forest.[4]

Like the 2005 revisions, the revisions in 2006 also resulted in the creation of a map

identifying lynx habitat, but there was no new delineation of LAU's on individual forests.

In 2007, the Forest Service adopted the Northern Rockies Lynx Management

Direction (the "Lynx Management Direction"), which set forth goals, standards, and

guidelines for all LAU's.  The Lynx Management Direction also amended the Forest

Plans for the Caribou-Targhee National Forest and incorporated lynx conservation

guidelines into those plans.  The Lynx Management Direction superceded the interim

Conservation Agreement between the Forest Service and the Fish and Wildlife Service,

including the 2005 and 2006 revisions.

---

[4] 2006 Amendment to the Canada Lynx Conservation Agreement, *available at* http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/53790_FSPLT1_019641.pdf. at 42.

**MEMORANDUM DECISION AND ORDER - 5**

The Lynx Management Direction provided a definition of lynx habitat and identified the vegetation characteristics that contribute to lynx habitat.  It retained the definition of "occupied habitat" implemented by the 2006 revisions to the Conservation Agreement and included a map, based on the 2006 revisions, that displayed occupied and unoccupied lynx habitat located within the Northern Rockies Lynx Planning Area.  The Split Creek Pre-Commercial Thinning Project is located within an area designated "occupied" by the Lynx Management Direction.  In lynx habitat designated "occupied," the Lynx Management Direction mandates clear protection of lynx and snowshoe hare habitat.  Pre-commercial thinning in snowshoe hare habitat was also identified as a threat to lynx productivity, and the Lynx Management Direction adopted a series of standards restricting pre-commercial thinning activities in snowshoe hare habitat.  The map included with the Lynx Management Direction did not, however, delineate LAU's and expressly acknowledged that it was not an official LAU map for individual forests.

## B. Events Leading to Approval of the Split Creek Pre-Commercial Thinning Project

The Split Creek Pre-Commercial Thinning Project (the "Project") originally was approved in December of 2007 and relied on the map generated as a result of the 2005 revisions to the interim Conservation Agreement between the Forest Service and the Fish and Wildlife Service.  At that time, the 2005 map had not been reviewed or approved by the regional Forester.  After receiving objections to the use of a map that had not been exposed to public comment, the Forest Service withdrew the project in August of 2008 to

**MEMORANDUM DECISION AND ORDER - 6**

provide notice and allow comment on both the 2005 LAU map and the Project.

Under the ESA, when a species is listed as threatened, the Fish and Wildlife Service is required to "designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3).  As indicated above, the Fish and Wildlife Service listed the lynx as threatened in 2000.  The agency did not, however, designate critical habitat for the lynx as required by the ESA.  This failure was challenged in federal court, and resulted in a court order requiring the Fish and Wildlife Service to "undertake prompt rulemaking to designate [l]ynx critical habitat." *Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 26 (Dist. D.C. 2002).

Following the Fish and Wildlife Service's attempt to comply with the above order, and more legal challenges, on February 25, 2009, the Fish and Wildlife Service published its final revised critical habitat designation for the lynx.  *See Alliance For the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1129 (Dist. Mont. 2010.)  The revised rule designated five units, encompassing approximately 39,000 square miles as critical habitat. Unit three includes a small part of northeastern Idaho in portions of Boundary County. The remaining units are located in Maine, Minnesota, Washington, Wyoming, and Montana.  The Project, which is located in southeast Idaho, is not located within any lynx habitat designated critical by the Fish and Wildlife Service.[5]

---

[5]  Plaintiffs point out that the Fish and Wildlife Service's final revised rule was successfully challenged in *Alliance For the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126 (Dist. Mont. 2010).  In that case, the Alliance (and three other environmental groups) challenged the Fish and Wildlife Service's failure to designate critical habitat in certain national forests in

**MEMORANDUM DECISION AND ORDER - 7**

In February of 2009, the Caribou-Targhee National Forest submitted the 2005 LAU map to the Forest Service's Regional Office, and on April 29, 2009, the Regional Forester approved the 2005 LAU map.  The 2005 LAU map made significant changes to the LAU map created in 2001, including the removal of nine LAU's.  These changes were made pursuant to "Standard LAU S1" set forth in the Lynx Management Direction, which provides that "Changes in LAU boundaries shall be based on site-specific habitat information and reviewed by the Forest Service Regional Office."

According to the Forest Service, the changes to the 2001 LAU map were made based on the following information: LAU mapping direction contained in the LCAS; the history of lynx occurrence information contained in the Ecology and Conservation of Lynx in the United States; recent lynx occurrence information gathered from the national

---

Montana and Idaho, including the Nez Perce National Forest and the Clearwater National Forest – both located in northern Idaho.  The Alliance argued that the Fish and Wildlife Service's reliance on the absence of evidence of reproduction of lynx in the relevant forests was arbitrary and constituted error.  The court agreed, stating that the "Service arbitrarily treated evidence of reproduction as a litmus test rather than as a relevant factor to consider if the challenged national forests in Montana and Idaho contain the primary constituent element [referring to the biological characteristics that define lynx habitat]." *Id*. at 1135.  The court ordered the Fish and Wildlife Service to consider the physical and biological features of the occupied areas to determine whether they should be designated as critical habitat under the ESA, but stated that the agency's final rule would stay in effect "while the Service revisits the issue." *Id*. at 1135, 1145.

The parties in this case are not clear on what effect, if any, the court's order in *Lyder* has on this case in general or on the Fish and Wildlife Service's determination that the Caribou-Targhee National Forest does not contain critical lynx habitat.  Plaintiffs argue that, since the same flawed procedure was used concerning the Caribou-Targhee National Forest, the determination that the Forest does not contain critical habitat is just as invalid as the Service's conclusions concerning the forests in northern Idaho.  The Court notes that Plaintiffs have not challenged the Fish and Wildlife Service's failure to designate critical habitat in the Caribou-Targhee National Forest, and, as such, the issue simply is not before the Court at this time.

**MEMORANDUM DECISION AND ORDER - 8**

lynx detection surveys (commonly referred to as lynx hair-snare grids), reported

observations, and one radio-collared lynx; two snowshoe hare studies completed on the

Caribou-Targhee National Forest; information and recommendations from the July 2003

Lynx Interagency Coordination Meeting held in Island Park Idaho; new vegetation

analysis done on BLM and National Forest lands in the Centennial Mountains and Plateau

area; and a second evaluation of vegetation in the Caribou Range Overthrust Mountain

Ecological Subsection. (AR 83-84.) In response to the proposed adoption of the 2005

LAU map, the Regional Forester made the following comments:

> As per your request, the Region 4 Wildlife staff reviewed
> your 2005 revision of the Caribou-Targhee National Forest
> Lynx Analysis Unit (LAU) Map.  *The LAU map and the
> process used to develop it are consistent with direction
> contained in the Northern Rockies Lynx Management
> Direction (NRLMD) and concepts outlined in the Lynx
> Conservation Assessment and Strategy.*  It is our expectation
> that the Forest will use this new map to implement
> requirements of the NRLMD and will serve as the reference
> for mapped Lynx habitat on the Forest.  *We recognize that the
> 2005 LAU map represents more recent analysis of lynx
> habitat than that contained in Figure 1-1 of the NRLMD.
> Also, we recognize that Figure 1-1 in the NRLMD was never
> intended to accurately depict mapped lynx habitat at the
> forest scale.*

(Biological Assessment for Canada Lynx for Split Creek Precommercial Thinning

Project, July 22, 2009, AR 64-65) (emphasis added).

When evaluating whether to approve the Project, pursuant to Section 7 of the ESA,

the Forest Service determined that the Project "may affect" the lynx, and therefore

consulted with the Fish and Wildlife Service before authorizing the Project. (AR 49.) As

**MEMORANDUM DECISION AND ORDER - 9**

part of the consultation, the Forest Service prepared a Biological Assessment for the lynx. The Biological Assessment addressed the potential effects of the Project on the lynx and its habitat, including snowshoe hare habitat.

In evaluating the potential adverse effects of the Project on the lynx, the Forest Service noted the following observations in the Biological Assessment: for the time period between 1874 through 2005, only one radio-collared male lynx crossed the Project area during the summers of 2000 and 2001 (AR 49); no lynx tracks have been documented on any established winter snow tracking routes from 2005 to the present (*id*.); there are no resident reproducing lynx in the Caribou-Targhee National Forest (AR 71); since 2005, winter snow tracking routes, including one in the Project area have demonstrated no verified or possible lynx tracks (AR 49); and during the winter of 2009, the Forest Service positioned 40 winter snow tracking routes within the Project area and did not observe any lynx or lynx tracks on any route. (AR 51, 71.)  Based on these observations, the Forest Service acknowledged the possibility of an individual lynx moving through the Project area, but found that, in the event of this unlikely scenario, the lynx only would be displaced (required to move around the area). (AR 71.)  The Forest Service specifically found that the Project would not result in any lynx mortality. (*Id*.)

The Forest Service also considered the potential effects the Project would have on lynx habitat, as distinct from the potential effects on the lynx itself.  The Biological Assessment notes that the Project area is not located within habitat designated "critical" by the Fish and Wildlife Service under the ESA. (AR 54.)  The Biological Assessment

also makes clear that the Project area is not located within any designated LAU's. (AR 60.)  The physical characteristics of the Project area also were assessed and found not to be the type associated with lynx habitat. (AR 60, noting that the "lodgepole pine forests in this area grow on coarse volcanic soils that are well drained . . . , do not develop understories of subalpine fir . . . [and] Lynx do not appear to be associated with dry forest habitat types.")

Similarly, because the snowshoe hare makes up the principle diet of the lynx, and the fact that the hare's habitat has been directly tied to the habitat of the lynx, the Forest Service also examined the potential effects of the Project on snowshoe hare habitat. (AR 69.)  According to the Forest Service, between January 2009 and March 2009, a total of 40 transects were established within the proposed thinning units for the purpose of documenting the presence of the lynx. (AR 60.)  No lynx were documented, but the transects did produce information on the presence of other wildlife species, including the snowshoe hare. (*Id*.) These winter tracking routes demonstrated what the Forest Service characterizes as a relatively low presence of snowshoe hare in the Project area; snowshoe hare were found on 9 of the 40 (or 23%) of the transects. (*Id*.)  Of the nine transects indicating the presence of hares, four indicated high densities of tracks, and five indicated low densities. (AR 69-70.)

It also was noted that the information obtained from the snow tracking analysis was consistent with previous snowshoe hare research done in the Caribou-Targhee National Forest. (AR 70.)  More specifically, previous research "found that hares occur in

reasonably high concentrations when stand conditions are exactly right[,]" but based upon the characteristics of the Project area, the Forest Service concluded that "while some stands in Island Park can produce hares at densities similar to those observed in the Seeley Lake area (an area known to support lynx [in Montana]), these stands will remain scattered, and will only constitute a small proportion of the landscape." (*Id*.)

Based on the above findings, the Forest Service determined that the Project was "not likely to adversely affect" the lynx or its habitat (AR 71), and requested the Fish and Wildlife Service's concurrence. (AR 35.)  On August 11, 2009, after reviewing the Forest Service's Biological Assessment, the Fish and Wildlife Service concurred with the finding that the Project was "not likely to adversely affect" the Canada Lynx. (AR 35.) The Fish and Wildlife Service listed several reasons for its concurrence, including: lynx occurrences in the Project area were historically rare and "extremely unlikely" (AR 36-37); no documented reproducing lynx occurred within the Project area (AR 36); the Project area is not located within any designated critical habitat or within any LAU's; while the Project does occur within linkage habitat, "all management direction applicable to linkage areas will be met" (AR 36); and winter snow tracking transects in the Project area "revealed that snowshoe hares, which make up the majority of a lynx's diet, were not present on 31 of the 40 transects surveyed." (AR 37.)  The Fish and Wildlife Service concluded:

> Based on the information provided in the Assessment, the cooperation and coordination between the Service and Forest while developing the Canada lynx LAU maps for the Forest,

> the two streamlining meeting (in March 2007 and March 2009) to discuss the Split Creek Project, and the meeting on July 6, 2009 also to discuss the Split Creek Project, the Service concurs with the Forest's determination that the proposed Split Creek Project may affect, but is not likely to adversely affect Canada lynx.

(AR 37.)

## C.     The Split Creek Project

Based on the Biological Assessment and the Fish and Wildlife Service's concurrence with the opinion that the Project was not likely to adversely affect the lynx, in December of 2009 the Forest Supervisor for the Caribou-Targhee National Forest authorized the Project.[6]  The Project authorized the pre-commercial thinning of approximately 7,000 acres of lodgepole pine (with a minor amount of aspen, Douglas-fir and subalpine fir) located within the Island Park and Madison-Pitchstone Plateaus Subsections of the Caribou-Targhee National Forest. (AR 35.)  "Approximately 2,000 - 4,000 acres are proposed to be thinned each year starting in 2010, depending on funding." (*Id*.)  "The areas identified to be thinned are past harvest units primarily composed of stands of lodgepole pine with 500 - 13,000 trees per acre [and] [t]he lodgepole would be thinned to a residual density of approximately 360 trees per acre." (*Id*.)

The Fish and Wildlife Service summarized the purpose of the Project as follows:

> The purpose of the Split Creek Project is to improve overall

_____

[6] *See* Decision Notice and Finding of No Significant Impact, *available at* http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/53790_FSPLT1_018796.pdf.

**MEMORANDUM DECISION AND ORDER - 13**

stand health.  The high tree density in the Split Creek Project
area results in less vigorous growth, which can eventually
lead to a stagnant forest.  The high level of competition
between the trees in the stand causes the trees to shed their
lower branches (self pruning), the tree crowns become very
thin, and the tree diameters remain small.  Thinning of the
stands would result in retention of lower live limbs, which
provides hiding cover for many wildlife species.  Thinning
would also result in less competition, which results in better
crown development and faster and bigger diameter growth,
providing more suitable habitat for cavity nesting birds, and
larger limbs for forest raptors to build nests.  Additionally,
large tree crowns provide more cone production for natural
regeneration and food for species that utilize conifer seed.

(AR 35-36.)

Logistically, contract crews using chainsaws have been and are being used to thin
the trees in the Project area.  There is to be no new road construction or reconstruction.
Trees that are felled are to be left on site, and, therefore, there will be no ground
disturbing activities due to machine piling or skidding. (AR 35.)

Year one of the Project commenced on July 8, 2010, and the Forest Service
thinned approximately 1,350 acres of lodgepole pine.  Year two of the Project
commenced on August 23, 2011, and is planned to thin approximately 2,400 acres of
lodgepole pine.  The thinning must be completed before the anticipated October snowfall.

## DISCUSSION

### A.    Legal Standard for Preliminary Injunctions

The United States Supreme Court has made clear that the issuance of a preliminary
injunction is "an extraordinary and drastic remedy" that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quoting 11A Wright & Miller, Fed. Prac. & Proc. § 2948 (2d ed. 1995)). In *Winter v. Natural Resource Defense Council, Inc.*, 555 U.S. 7 (2008), the Supreme Court held that, to obtain a preliminary injunction, the plaintiff must demonstrate: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent preliminary relief; (3) the balance of equities tips in plaintiff's favor; and (4) the injunction is in the public interest. 555 U.S. at 20.

"Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original).  Indeed, irreparable harm has been described as "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." 11A Wright & Miller, Fed. Prac. & Proc. § 2948. Where a plaintiff fails to demonstrate a likelihood of irreparable harm in the absence of preliminary relief, the court need not address the remaining elements of the preliminary injunction standard. *See Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011).

Here, the Court finds that Plaintiffs have not demonstrated a likelihood of irreparable harm.  Thus, regardless of the strength of the merits of Plaintiffs' claims, in the absence of a showing of irreparable harm, Plaintiffs cannot obtain the relief they seek at this stage in the litigation.  The Court's finding on the irreparable harm issue is dispositive of Plaintiffs' motion and, as such, the Court need not assess the merits of

**MEMORANDUM DECISION AND ORDER - 15**

Plaintiffs' claims which will be before the Court again sooner rather than later on the parties' motions for summary judgment.[7]  Moreover, the motion in this case is time sensitive – year two of the thinning project already has commenced and is expected to be completed sometime in October of 2011 – requiring the prompt resolution of the motion. The Court finds that weighing in on the merits of Plaintiffs' claims at this time would not be the best expenditure of judicial economy.

## B.    Plaintiffs Have Failed to Demonstrate a Likelihood of Irreparable Harm

Plaintiffs must demonstrate a likelihood of irreparable harm to obtain a preliminary injunction. *Winter*, 555 U.S. at 20.  The *possibility* of irreparable harm is not enough. *Id.*, at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.") Plaintiffs carry the burden of persuasion in demonstrating irreparable harm and must do so through a "clear showing" of "substantial proof." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Indeed, the Ninth Circuit recently pointed out that "a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it." *Vilsack*, 636 F.3d at 1171 n. 6.

---

[7]  This case has been set to proceed on a Legal Track litigation schedule, (Dkt. 22), and the parties have expressed the expectation that this case will be resolved in its entirety through cross-motions for summary judgment.

**MEMORANDUM DECISION AND ORDER - 16**

In this case, Plaintiffs allege that the lynx and its habitat will be harmed irreparably in the absence of preliminary relief.  It is important to note that Plaintiffs do not allege any direct harm to the lynx itself or any designated lynx habitat.  Concerning harm to the actual animal, while Plaintiffs take issue with the Forest Service's conclusions concerning whether the Project area should be deemed protected lynx habitat, they do not dispute the underlying scientific data evaluated by the Forest Service in reaching its conclusions, which ultimately indicated that there are no lynx in the Project area.[8]  In its Biological Assessment, the Forest Service provided the following data related to the lynx and the Project area: for the time period between 1874 through 2005, only one radio-collared male lynx crossed the Project area during the summers of 2000 and 2001 (AR 49); no lynx tracks have been documented on any established winter snow tracking routes from 2005 to the present (*id*.); there are no resident reproducing lynx in the Caribou-Targhee National Forest (AR 71); since 2005, winter snow tracking routes, including one in the Project area have demonstrated no verified or possible lynx tracks (AR 49); and during the winter of 2009, the Forest Service positioned 40 winter snow tracking routes within the Project area and did not observe any lynx or lynx tracks on any route. (AR 51, 71.)

---

[8]  Plaintiffs contend that the Forest Service looked at the wrong evidence in certain circumstances (such as using a subalpine fir proxy in evaluating areas for lynx and snowshoe hare habitat), but Plaintiffs do not appear to challenge the validity of the data itself.

**MEMORANDUM DECISION AND ORDER - 17**

Plaintiffs do not challenge this data and have not supplied any objective information indicating that it is inaccurate.[9]  Plaintiffs argue that, assuming lynx are in the forest or will come to the forest in the future – an assumption that is not supported by the evidence in the record – the lynx would be displaced and the displacement would constitute irreparable harm. (Pls.' Reply at 9, Dkt. 32.)  This hypothetical displacement of lynx does not satisfy the "likelihood of irreparable harm" standard contemplated by the Supreme Court in *Winter. See American Bald Eagle v. Bhatti*, 9 F.3d 163, 166 (1st Cir. 1993) (holding that under the ESA, injunctive relief cannot issue based solely on the possibility that an endangered species might be disturbed; plaintiffs must show actual harm or harassment), cited with approval in *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 787 (9th Cir. 1995).  Furthermore, the Court notes that this is the second year of thinning pursuant to the Split Creek Project.  In July of 2010, the Forest Service thinned approximately 1,350 acres of lodgepole pine.  Plaintiffs have presented no evidence that the thinning in 2010 displaced any lynx or otherwise harmed the lynx or lynx habitat.

Concerning lynx habitat, Plaintiffs acknowledge that the portion of the Caribou-Targhee National Forest containing the Project area has not been designated as "critical

---

[9]  Plaintiffs have provided the declaration of Sara Johnson. (Dkt. 6.)  In her declaration, Ms. Johnson states that she has visited the Project area and that in her opinion as a wildlife biologist, "[t]he lodgepole pine regeneration in many areas was quite dense[] and . . . appeared suitable habitat for snowshoe hares." (*Id*. at 2.)  Ms. Johnson also opines that "[i]t was also clear that even in early winter, heavy snow accumulations in this analysis area provided suitable winter lynx habitat." (*Id*.)  Ms. Johnson does not provide any quantitative or qualitative justifications for her opinions.

habitat" by the Fish and Wildlife Service and that the Project area is not within an LAU on the 2005 map.  In fact, one of the major legal challenges in this case is whether the Forest Service properly adopted the 2005 LAU map.  In this vein, Plaintiffs argued at the hearing on their motion for an injunction that the Project area "could be" critical habitat. Even assuming for the purposes of this order that the Project area is within critical habitat and that the Plaintiffs have demonstrated a likelihood of success on the merits of their challenge to the adoption of the 2005 LAU map, the Court finds that Plaintiffs have not presented evidence establishing a likelihood of irreparable harm to the habitat under the standards set forth in the ESA.  The standard for harm to habitat under the ESA will be discussed more fully below in connection with Plaintiffs' arguments concerning the effects the Project will have on the snowshoe hare habitat.

Plaintiffs' principle argument concerning irreparable harm relates to the habitat of the snowshoe hare.  Plaintiffs state that "the Project will destroy snowshoe hare habitat in the logged stands, [and that this is] exactly the type of harm the ESA and the NRLMD seek to prevent." (Pl.s' Reply at 9, Dkt. 32.)  Plaintiffs also state that the "[p]re-commercial thinning of snowshoe hare habitat is a primary and significant threat to lynx as a species." (*Id*.)  Defendants do not dispute that the snowshoe hare is the primary food source of the lynx or that snowshoe hare habitat has been directly linked to the habitat of the lynx.  Defendants contend, however, that in the absence of any evidence of lynx in the Project area, the small amount of snowshoe hare habitat that will be adversely effected does not rise to the level of irreparable harm.

**MEMORANDUM DECISION AND ORDER - 19**

The record indicates that snowshoe hares were not present on 31 of the 40 transects surveyed in the Project area. (AR 37.)  In other words, snowshoe hares were detected on 23% of the transects.  However, of the nine transects indicating the presence of snowshoe hares, only four demonstrated hares in high density. (AR 69.)  Based on these numbers and previous snowshoe hare research conducted in the Caribou-Targhee National Forest, the Forest Service concluded "that while some stands in Island Park can produce hares at densities similar to those observed in the Seeley Lake area (an area known to support lynx [in Montana]), these stands will remain scattered, and will only constitute a small proportion of the landscape." (AR 70.)

At the hearing on Plaintiffs' motion, counsel for Plaintiffs asserted that "23% is pretty significant."  The Court, however, has no basis from which to evaluate this assertion – other than the contrary statements contained in the Biological Assessment – because Plaintiffs have failed to support this conclusion with any of their own scientific reports or expert declarations.  In other words, it is Plaintiffs' counsel's word against the Forest Service's statements contained in the Biological Assessment.  The Court is guided in this regard by the ESA's definition of "harm" as it is applied to habitat of endangered species.  The Code of Federal Regulations defines "harm" within the meaning of the ESA as "an act which actually kills or injures wildlife [and] . . . may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

**MEMORANDUM DECISION AND ORDER - 20**

The Court makes two observations from the above definition.  First, the definition requires that the modification or degradation of habitat be "significant."  Plaintiffs have not demonstrated that the loss of 23%, or more accurately 10% (which represents the percentage of hares found in high densities), would result in "significant habitat modification or degradation."  Second, the definition requires the habitat modification or degradation to result in injury or death.  Plaintiffs have not presented any evidence that the loss of approximately 10% of the snowshoe hares found in high densities on the transects measured within the Project area will result in the injury or mortality of any lynx.

Defendants point out that irreparable harm under the ESA requires proof that the alleged harm would be significant for the species as a whole.  (Def.s' Resp. at 18, Dkt. 31.)  Indeed, courts within the Ninth Circuit have denied injunctive relief where the harm is not significant to the overall population of the species in question. *Defenders of Wildlife v. Salazar*, 2009 WL 8162144 at *4 (Dist. Mont. Sept. 8, 2009).  And "[o]ther district courts have issued injunctive relief where an agency action would cause harm to a small number of individual species' members, but always under circumstances in which the loss of those individuals would be significant for the species as a whole." *Pac. Coast Fed'n of Fisherman's Ass'n v. Gutierrez*, 606 F. Supp. 2d 1195, 1210 n.12 (E.D. Cal. 2008).

Plaintiffs direct the Court to the recent Ninth Circuit decision in *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).  In that case, the Alliance brought

**MEMORANDUM DECISION AND ORDER - 21**

an action against the Forest Service seeking to enjoin a logging project and timber sales. The district court denied the Alliance's motion for an injunction and the Ninth Circuit reversed, holding that the Alliance had satisfied all four preliminary injunction factors. The Court of Appeals specifically noted that the district court's order was brief and "did not describe or analyze the harm alleged by [the Alliance]." *Id*. at 1130-31.  Concerning irreparable harm, the court found the Alliance had sufficiently demonstrated "that the Project will harm its members' ability to 'view, experience, and utilize' the areas in their undisturbed state." *Id*. at 1135.

Plaintiffs argue that the harm found to be irreparable by the Ninth Circuit in *Cottrell* is the same as the harm alleged here.  The Court disagrees.  The cases are facially distinguishable.  First, in *Cottrell*, the Alliance did not allege violations under the ESA. In other words, the alleged harm in *Cottrell* was not tied to an endangered species. Rather, the alleged harm revolved around the removal of the trees themselves.  This is significant because Plaintiffs' claims under the ESA in this case are directly tied to the lynx and its habitat.  In fact, both of Plaintiffs' "standing" declarations make clear that the alleged harm relates to the lynx and its habitat. (*See* Decl. of Mike Garrity, Dkt. 5, and Decl. of Sara Johnson, Dkt. 6.)  The Ninth Circuit made clear in *Cottrell* that its holding did not stand for the proposition that "any potential environmental injury warrants an injunction." *Cottrell*, 632 F.3d at 1135 (internal quotations omitted).  Thus, Plaintiffs in this case cannot bring an action alleging harm to a particular threatened species and then

argue the presence of irreparable harm untethered to the alleged harm to that species.[10]

The cases are also factually distinguishable.  First, *Cottrell* involved a commercial logging project in which timber was being physically removed from the project site and sold.  Second, the logging project in *Cottrell* required the construction of 7 miles of temporary roads and reconditioning of about 3 miles of existing roads.  Unlike *Cottrell*, in this case the thinning Project is not commercial in nature; no trees are being removed from the site or sold; no heavy equipment is required to fell the trees, which are being cut down by hand; and no roads are being constructed or reconditioned.  The Court does not agree with the Plaintiffs that the harms in the two cases are the same.

The Court finds the Ninth Circuit's holding in *Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996), instructive.  There, the Ninth Circuit found a showing of imminent threat of future harm sufficient for an injunction under the ESA where listed birds were known to breed in the area that would be impacted by logging activities, and logging activities would impair ability to breed.  However, unlike the case now before the Court, in that case evidence was presented in the district court that the animal at issue in the case was actually present in the affected area. *Id*. at 1067.  Specifically, the court found evidence of "approximately 100 detections of marbled murrelets at Owl Creek,

---

[10]  Plaintiffs did not invoke any of their NEPA claims in their motion for a preliminary injunction.  Plaintiffs' counsel did make some arguments based on NEPA at oral argument and the Government objected to these arguments on the basis that they were not raised in Plaintiffs' motion.  Plaintiffs have not waived the right to address the merits of their NEPA claims in this litigation.  However, because they were not briefed in the motion for a preliminary injunction, the Court will not consider them here.  The Court also notes that Plaintiffs' claims under the National Forest Management Act are directly tied to the lynx and its habitat.

throughout the birds' breeding season, for a period of three consecutive years,"
"[e]vidence of occupied nesting behavior," and "several experts testified to the
probability of the murrelets' nesting in Owl Creek, and that implementation of Pacific
Lumber's harvesting plan would likely harm marbled murrelets by impairing their
breeding." *Id.*

      Here, while the record indicates that the Canada Lynx is known to have some
historic presence within the boundary of the Caribou-Targhee National Forest, Plaintiffs
have presented no evidence of the lynx's occupancy within the Project area.  Similarly,
Plaintiffs have not submitted any scientific evidence or quantitative expert testimony
indicating that the Project will have an adverse impact on the lynx or its habitat.
Plaintiffs cannot obtain preliminary relief – a drastic remedy – simply by claiming that an
agency's science is flawed or that the agency's conclusions drawn from undisputed facts
are erroneous without presenting evidence supporting their arguments.  Plaintiffs bear the
burden of demonstrating a likelihood of irreparable harm.  They have failed to do so in
this instance and their motion for a preliminary injunction and temporary restraining order
will be denied.

**MEMORANDUM DECISION AND ORDER - 24**

## <u>ORDER</u>

Based on the foregoing, the Court being otherwise fully advised in the premises,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction and

Temporary Restraining Order (Dkt. 25) is DENIED.



DATED: September 9, 2011

_____
Honorable Candy W. Dale
Chief United States Magistrate Judge