DANA M. JOHNSON
Law Office of Dana Johnson, PLLC
P.O. Box 9623
Moscow, ID 83843
Tel: (208) 874-3158
Fax: (888) 741-2050
johnsondanam@gmail.com
Idaho State Bar # 8359

K.E.PURCIE BENNETT
Cottonwood Environmental Law Center
24 S. Willson Ave., Suite 6-7
Bozeman, MT 59715
Tel: (406) 587-5800
Fax: (406) 587-5801
purcie@cottonwoodlaw.org
*Pro Hac Vice*

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
EASTERN DIVISION**

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL & ALLIANCE FOR THE WILD ROCKIES, ) ) ) | |
| Plaintiffs, ) ) | Case No.: 4:11-cv-212 |
| vs. ) ) ) | **BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES FOREST SERVICE, *et al.*, ) ) | |
| Defendants. ) ) ) | |

# INTRODUCTION

This case is about protection of an imperiled species – the threatened Canada lynx. The United States Fish and Wildlife Service listed the Canada lynx as a threatened species under the Endangered Species Act in 2000 due to "lack of guidance for conservation of lynx and snowshoe hare habitat …" and subsequent authorization of actions that may cumulatively adversely affect the lynx. FS001669; FS004592.  Little is known about lynx in the contiguous United States, partly due to the elusive habits of this "ghost cat." FS013170. Historically, lynx inhabited states spanning from Maine to Washington, but it is unknown how many lynx remain in the contiguous United States. FS013171; FS004592.

Lynx are highly mobile and generally move long distances (greater than 60 mi (100 km)); they disperse primarily when snowshoe hare populations decline; subadult lynx disperse even when prey is abundant, presumably to establish new home ranges; and lynx also make exploratory movements outside their home ranges. 74 Feg. Reg. at 8617.  The contiguous United States is at the southern edge of the boreal forest range, resulting in limited and patchy forests that can support snowshoe hare and lynx populations. *Id.*; FS013197.

Lynx subsist primarily on a prey base of snowshoe hare, and survival is highly dependent upon snowshoe hare habitat, forest habitat where young trees and shrubs grow densely. FS004589; FS001531, FS001534.  In North America, the distribution and range of lynx is nearly "coincident" with that of snowshoe hares, and protection of snowshoe hares and their habitat is critical in lynx conservation strategies. FS004589. At the southern end of their range, lynx persist at the lower threshold of necessary hare density, with starvation an important cause of lynx death.  FS013138; FS004598.  And, unlike snowshoe hare cycles in the northern lynx range, snowshoe hare numbers in the southern latitudes do not appear to demonstrate pronounced

cyclical fluctuations; densities may be lower and relatively stable over time with hares existing in more of a patchwork of habitat.  FS13150; FS013158; FS013161; FS004598.  Several studies indicate that lynx and snowshoe hare counts are highest in young (20-year-old to 43-year-old), dense lodgepole pine stands.  FS013156-FS013157; FS013168.   Lodgepole pine stands, in some instances, had snowshoe hare densities that were nine times greater than Engelmann spruce – subalpine fir stands. FS013157.

Precommercial thinning is detrimental to lynx habitat. FS013195. Generally, after 20 to 30 years of logging and thinning, most plots have regrown enough to provide cover for hares. FS013173. "But once the plots contain enough vegetation to attract cats again, loggers tend to go in and lop away some of the trees so that remaining ones more quickly grow to commercial sizes. It's a good way to run a timber company, but it's hard on lynx."  FS013173. This is because management practices, such as forest thinning, that reduce horizontal cover degrade lynx habitat. FS013195.

The Split Creek Precommercial Thinning Project would cut dense, lodgepole pine stands currently supporting 500 to 300,000 trees per acre (with an average of over 2,000 trees per acre), reducing the density to 360 trees per acre with 11 feet by 11 feet spacing between trees. FS011570. The Forest Service admits that high density lodgepole pine stands are "guaranteed to be used" by snowshoe hares and that there appears to be a stem density threshold for snowshoe hares at about 1,150 trees per acre. FS003302.  Yet, thinning is planned at a level much below this stem density threshold in areas that were arbitrarily and illegally removed from management protections that prohibited precommercial thinning.

**STANDARD OF REVIEW**

Pursuant to the APA, 5 U.S.C. § 701 et seq., this Court "may direct that summary

judgment be granted to either party based upon … review of the administrative record." *Great*

*Basin Mine Watch v. Hankins*, 456 F.3d 955, 961 (9th Cir. 2006).  Summary judgment is

particularly appropriate for resolving agency action challenges where the legality of the actions

is based upon an administrative record. See *Occidental Engr. Co. v. INS*, 753 F.3d 766, 770 (9th

Cir. 1985). The Court shall set aside an agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," "short of statutory right," or found to be

"without observance of procedure required by law." 5 U.S.C. Sec. 706(2)(A),(C),(D); *Klamath*

*Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 554 (9th Cir. 2006). The review must be

"searching" and "careful", and should determine whether the decision was based upon a

consideration of the relevant factors. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360,

378 (1989). An action is arbitrary and capricious if the agency "relied on factors which Congress

has not intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the agency, or is

so implausible that it could not be ascribed to a difference in view or the product of agency

expertise*." Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance Co*.,

463 U.S. 29, 43 (1983).

## ARGUMENT

### I.   NEPA VIOLATIONS

NEPA was enacted "to protect the environment by requiring that federal agencies

carefully weigh environmental considerations and consider potential alternatives to the proposed

action before the government launches any major federal action." *Lands Council v. Powell*, 395

F.3d 1019, 1026 (9th Cir. 2004). NEPA "emphasizes the importance of coherent and

comprehensive up-front environmental analysis to ensure informed decision making to the end

that the agency will not act on incomplete information, only to regret its decision after it is too

late to correct." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir.

1998)(citation and internal punctuation omitted). NEPA requires that agencies take a "hard look"

at the environmental effects of their actions and to disclose those effects for informed public

comment. *Lands Council,* 395 F.3d at 1027.  "Accurate scientific analysis … and public scrutiny

are essential to implementing NEPA."  40 C.F.R. § 1500.1(b).  Accordingly, it is the task of the

Court to "ensure that the agency has taken a 'hard look' at the potential environmental

consequences of the proposed action." *Native Ecosystems Council v. U.S. Forest Service*, 418

F.3d 953, 963 (9th Cir. 2005)(citing *Klamath-Siskiyou Wildlands Ctr. V. Bureau of Land Mgmt*.,

387 F.3d 989, 993 (9th Cir. 2004)).

### A. Defendants violated NEPA and the APA by failing to provide appropriate NEPA analysis for plan-scale decisions and failing to take the requisite "hard look" at mapping and Project effects on the environment.

#### 1. Failure to prepare an EIS

NEPA directs federal agencies to prepare a detailed Environmental Impact Statement

("EIS") for federal actions that may significantly affect the quality of the human environment.

42 U.S.C. § 4332(2)(C).  The reason for this is two-fold: 1) to ensure that the agency will have

available and will carefully consider detailed information on significant environmental impacts

when it makes decisions, and 2) to "guarantee that the relevant information will be made

available to the larger audience that may also play a role in both the decision-making process and

the implementation of that decision."  *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 349

(1989); 40 C.F.S. § 1501.2(b).  "[I]f substantial questions are raised regarding whether the

proposed action may have a significant effect upon the human environment, a decision not to

prepare an EIS is unreasonable."  *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir.

1998).  An Environmental Assessment ("EA") may be prepared to determine whether significant impacts may occur and would thus require an EIS.  *High Sierra Hikers Association v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004).

NEPA regulations list ten factors for determining whether an action is significant and thus whether the action would trigger the need for an EIS.  *See* 40 C.F.R. § 1508.27.   Several of these factors exist in this case:

> a.   *A significant effect may exist even if the agency believes the effect will be beneficial in the end. 40 C.F.R. § 1508.27(b)(1).*

While the Forest Service is not alleging that the 2005 remapping will be beneficial to lynx and their habitat, they are speculating that the Split Creek Precommercial Thinning Project may be beneficial in the long run.  FS012225.  A potential beneficial effect is not sufficient grounds to excuse the necessity of completing an EIS for the action.  *See* 40 C.F.R. § 1508.27(b)(1).

> b.   *Significance may be triggered if the geographic area has unique characteristics. 40 C.F.R. § 1508.27(b)(3).*

The regulations list park lands, prime farmlands, wetlands, wild and scenic rivers, and ecologically critical areas as non-exclusive examples of areas demonstrating unique characteristics.  40 C.F.R. § 1508.27(b)(3).  The geographic area in this case is National Forest land, much of which had been deemed occupied, suitable habitat and managed through Lynx Analysis Units ("LAU") for a species protected under the Endangered Species Act. FS004820, FS004821.  The ESA focuses heavily on protection of habitat for species falling under its provisions, indicating that habitat for these species is ecologically critical.  *See* 16 U.S.C. § 1531(b).  The area is a unique resource for Canada lynx.

> c.   *An action may be significant if it is likely to be highly controversial. 40 C.F.R. §1508.27(b)(4).*

The Forest Service explains that there are no highly controversial effects because of "the limited context, size and location of the project…"  FS012225. This statement focuses on Project effects alone and completely ignores the removal of hundreds of thousands of acres of threatened species habitat from management protection, an action that is likely to be highly controversial. Because the 2005 remapping process was not subjected to its own NEPA analysis and because mention of the 2005 map was sparse in the scoping documents for the Split Creek Project, the public did not have adequate opportunity to express its concern.

> d.  *An action may be significant if the effects on the environment are highly uncertain or involve unique or unknown risks.  40 C.F.R. § 1508.27(b)5).*

The Forest Service argues that it has extensive experience with precommercially thinning lodgepole pine and thus the effects are not uncertain. FS012226. However, research and literature on the ecology of lynx in the southern portion of its range is sparse. FS013150. Because little is known about this imperiled species, conservation guidelines detailed in the LCAS are "decidedly conservative, especially with respect to timber management, and are applied broadly to cover all habitats thought to be of possible value to lynx and hare." FS013150-13151. Precommercial thinning is deemed a primary threat and therefore has specific restrictions in lynx management guidelines. FS001702, FS001703. Additionally, many of our documented records for lynx occurrence come from trapping records. FS004630. Yet, changes in trapper success may not accurately reflect changes in lynx population levels as lynx tend to disperse from home-range areas and become more vulnerable to trapping as prey becomes scarce. FS013159. We also know relatively little about the extent and duration of fluctuations in southern hare populations. FS013195; FS013209. There are many unknowns when it comes to lynx, and the Forest Service should have erred on the side of caution.

> e.  *Significance may be triggered if the action might establish a precedent for future actions or represent a decision in principle about a future consideration. 40 C.F.R. § 1508.27(b)(6).*

In this case, the Forest Service chose to remove nearly 400,000 acres of LAUs from the map, and thus from management protections, without engaging in NEPA review for the remapping and by circumventing that review in its site-specific Project analysis.  *See* FS011552, 11553.  At the site-specific level, the Forest Service failed to prepare an EIS and instead elected to only prepare an EA for the Project, FS012224, even though this was the only means through which the public could comment on and scrutinize the landscape-scale remapping.  If the Forest Service is not ordered to conduct proper NEPA review in this case, the Forest Service will likely evade NEPA review on future actions.

> f.  *Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. 40 C.F.R. § 1508.27(b)(7).*

While the Split Creek Project is limited to 7,000 acres of precommercial thinning, this is merely the first site-specific implementation of the landscape-scale remapping of LAUs on the Forest.  *See* FS011552-11553.  The several hundred thousand acres removed from LAUs, acres that were previously protected from precommercial thinning, will now similarly be open to thinning and logging.  *See* FS011558.  Because the Forest Service has demonstrated a concern that there are 125,000 acres of lodgepole pine ready for thinning, that more goes out the window every year that thinning is not done, and that the only reason for the precommercial thinning ban is because of hares, it is reasonable to anticipate that these acres, now removed from the restrictions of LAU management, will be precommercially thinned.  FS004796, 4797.  In fact, the Forest Service admits that it was looking to thin lodgepole pine at a landscape scale prior to LCAS restrictions.  *Id.*  Precommercial thinning, an activity specifically restricted in lynx

management guidelines, on over nearly 400,000 acres of the landscape is likely to have a significant effect on the environment.

   g. *An action may be significant if it may adversely affect an endangered or threatened species or its habitat that has been designated critical. 40 C.F.R. § 1508.27(b)(9).*

   The removal of nearly 400,000 acres of LAUs, the re-designation of primary suitable habitat to linkage habitat, and the precommercial thinning of 7,000 acres of lodgepole pine in an area where it was previously forbidden has the potential to adversely affect the threatened Canada lynx.  There is evidence of lynx and its primary prey, snowshoe hare, on the Forest and around the Project area.  FS005645; FS005613; FS005618.  We do not know whether or not the area should be designated critical habitat because the Forest used the same flawed analysis in determining there was no critical habitat as was found invalid through a court challenge.  *See Alliance for the Wild Rockies v. Lyder*, 728 F.Supp.2d 1126, 1135 (D. Mont. 2010).  An EIS should have been completed for the Split Creek Precommercial Thinning Project and the 2005 LAU map.

   h. *An action may be significant if it threatens a violation of Federal, State, or local law. 40 C.F.R. §1508.27(b)(10).*

   Defendants had notice through Plaintiffs' comments, Plaintiffs' appeal, and Plaintiffs' 60 day notice of intent to sue under the Endangered Species Act that the agencies' actions threated violations of NEPA, APA, NFMA, and the ESA.  The Forest Service still failed to prepare an EIS for the Project and failed to complete any NEPA analysis for the 2005 map in violation of NEPA.

  **2.** **Failure to assess cumulative impacts of the Project and of the 2005 LAU map at the appropriate scale**

   a. *Insufficient cumulative effects analysis*

The Split Creek Project record is not supported by independent NEPA analysis sufficient to satisfy Defendants' NEPA duties.  NEPA requires that "where several actions have a cumulative or synergistic environmental effect, this consequence must be considered in an EIS." *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990).  Cumulative environmental impacts result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions…" 40 C.F.R. § 1508.7.  When assessing cumulative impacts, "the Environmental Impact Statement must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between these projects, are thought to have impacted the environment." *Lands Council v. Powell,* 395 F.3d 1019, 1028 (9th Cir. 2004).  The Court in *Lands Council*, when discussing NEPA requirements for timber harvest projects, explained that a cumulative effects analysis should provide "adequate data of the time, type, place, and scale of past timber harvests and should have explained in sufficient detail how different project plans and harvest methods affected the environment." *Id*.  The Split Creek Project record does not list prior pre-commercial thinning projects in the area nor the effects of specific prior pre-commercial thinning projects on the environment, particularly on snowshoe hare and lynx habitat, in violation of NEPA.

     *b.   Illegal tiering and insufficient scope of cumulative effects analysis*

Defendants' failure to analyze and disclose the impacts of landscape-scale LAU remapping renders each related decision arbitrary and capricious as well.  When an agency implements a broad program, policy, or plan through a site-specific action, NEPA allows the agency to avoid discussing the broad cumulative impacts of the program, policy, or plan only if that program, policy, or plan has already gone through its own NEPA analysis.  *Kern v. Bureau of Land Management*, 284 F.3d 1062, 1074 (9th Cir. 2002); 40 C.F.R. Sec. 1508.25(a). Thus,

while NEPA allows an agency to "tier" analysis of one project to that of a broader project or

plan, it can only do so when the underlying document has itself met NEPA's requirements. *See*

*Id.* at 1062 (agency cannot tier to management guidelines that were not subject to NEPA

analysis); 40 C.F.R. § 1502.20. Tiered documents must include site-specific analysis, and if

tiered to a document without adequate NEPA analysis, the site-specific analysis must also

include the missing landscape level analysis. *Id.*; *Klamath-Siskiyou Wildlands Center v. Bureau*

*of Land Management*, 387 F.3d 989, 997 (9th Cir. 2004).

In *Kern*, the Ninth Circuit found that incorporation and implementation of management

guidelines through a site-specific timber sale project "tiered" the project to those guidelines, and

tiering the challenged project to the guidelines violated NEPA because the agency failed to

analyze the environmental impact of the guidelines in an EIS.  284 F.3d at 1073, 1074.  The

Court found the cumulative effects analysis in the site-specific EIS inadequate because it did not

include a "cumulative impact analysis of 'reasonably foreseeable future actions' *outside the*

*[project] area*." *Id.* at 1075(emphasis added).  Thus, the Court found that a failure to analyze

cumulative impacts of management guidelines in an EIS, and a subsequent decision to

incorporate those guidelines into site-specific actions without conducting a broad-scale

cumulative effects analysis in the site-specific NEPA document, violated NEPA.  *Id.* at 1073-

1075.

In this case, the challenged pre-commercial thinning Project incorporates and implements

the landscape-scale 2005 LAU map, which changed management standards and guidelines for

nearly 400,000 acres of occupied lynx habitat, even though the Forest Service never conducted

NEPA analysis for the map.  *See* FS011552, 11553.  The Forest Service explains in the Split

Creek EA that a 2007 decision authorizing the project was "withdrawn on July 28, 2008 to

provide an opportunity for public notice and comment on both the precommercial thinning proposal and on the Caribou-Targhee National Forest (C-TNF) updated Lynx Analysis Unit mapping for the Canada Lynx…" FS011552. Yet, in the same document, the Forest Service admits that the Split Creek EA "is a project-level analysis; its scope is confined to addressing issues and possible environmental consequences of the project.  It does not attempt to address decisions made at a programmatic level." FS011562. The site-specific analysis, which was limited to 23,250 acres in and surrounding the Project area, did not include an EIS. FS011550. Rather, the Forest Service determined that an EA was sufficient. FS012224. Thus, the only information available for the public on the 2005 map was a site-specific EA limited in scope to issues and environmental impacts at the Project level.

Similar to *Kern*, the agency here failed to mitigate the omission of the plan-scale 2005 map NEPA analysis because it limited its cumulative impact analysis to the Project area. 284 F.3d at 1075. Thus, the Project's incorporation and implementation of the new map, without providing a cumulative effects analysis of environmental impacts at the landscape level, constitutes illegal tiering in violation of NEPA.

**II.  ESA VIOLATIONS**

The ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978).  The U.S. Supreme Court holds that Congress "clearly [] viewed the value of endangered species as 'incalculable.'" *TVA v. Hill*, 437 U.S. at 187.  The "plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, *whatever the cost*." *Id.* (emphasis added).  Thus, the statute reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies."  *Id*. at 185.  Any

question as to whether an action violates the ESA must be resolved in favor of protecting the listed species. *See Connor v. Burford*, 848 F.2d 1441,1454 (9th Cir.1988)(Congress intended to give "the benefit of the doubt to the species.").

A. **Defendants violated the ESA and the APA by failing to use the best available science in approving the 2005 Map and in authorizing the Split Creek precommercial thinning project**

The ESA requires the use of the best available science. 16 U.S.C. 1536(a)(2). The APA requires Defendants to base their decisions on substantial supporting evidence in the record. 5 U.S.C. § 706 (2)(E). Decisions cannot be contrary to the evidence in the record and cannot fail to consider an important factor. There must be a rational connection between the facts in the record and the decision. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1119 (9th Cir. 2004).

Defendants support the remapping by stating "the Agency obtained more accurate and up-to-date science that supported the LAU remapping." Def Mot in Opp to PI., at 14. However, the facts in the record indicate that Defendants based their "not likely to adversely affect" conclusion for the Project upon scientific studies that fail to address important factors and fail to mirror reality on the ground.

**Snowshoe Hare and Subalpine Fir Studies**

In preparation for the remapping and in anticipation of precommercial thinning Project, four studies were conducted to reassess the LAUs. FS005610. Two studies assessed the presence of snowshoe hare in the Island Park area of the CTNF. *Id*. Two other studies assessed the presence of subalpine fir in the Island Park area of the CTNF. FS005602. The snowshoe hare studies found that in young lodgepole pine stands, "hare occur in reasonably high concentrations." FS005619. Another study determined that sapling patches of lodgepole pine

with high-density cover are important snowshoe hare habitat in the Island Park area. FS005621. The hare studies demonstrated that even though the area might not be optimal hare habitat, the hares were there in significant numbers. *Id*. The Forest Service notes they caught up to 11 hares on one grid when stand conditions were right, meaning when stands were comprised of dense lodgepole pine with appropriate crown height. FS005619. The Forest Service says that these stand conditions would be difficult to achieve and maintain because most snowshoe hare pellets were found in stands of 15-25 years of age and these stands are not likely to be productive 10-15 years into the future. *Id*. However, hares move between sapling stands and other forest types on a seasonal basis and depending on snow level, and the patchy nature of snowshoe hare habitat is not uncommon in the southern portion of lynx and snowshoe hare habitat range. FS005621; FS005624; FS004598.

Nearly all snowshoe hare research and recommendations in the administrative record focus on lodgepole pine as an important habitat condition for snowshoe hare. *See* FS00570, FS005622, 5626; FS005417; FS013152 (noting that "snowshoe hare density will be consistently highest in small lodgepole pine stands, followed by large spruce/fir and medium lodgepole pine, respectively."). The Forest Service admits that, in the Island Park pellet studies, hares were found in high densities exclusively within unthinned sapling-sized stands and that more pellets would have been found in thinned stands had they not been thinned. FS013326. Hares are known to use lodgepole pine stands with limited subalpine fir. FS013178; FS013208-13209; FS013342-13342, FS013346. Hares are known to use riparian areas. FS013249, 13254; FS013284; FS013151, 13152; FS013177, 13180; FS013187; FS013206. Hares are known to use aspen stands. FS013151; FS013249, 13252, 13255-13256. Yet, even with this information concerning the central role of lodgepole pine and the role of other important habitat characteristics, the

Forest Service focused its habitat modeling studies for the 2005 map almost exclusively on Sub Alpine Fir without explaining why this modeling was sufficient.  FS005623.  The Forest Service stated that "[a]reas being greater than seventy percent occurrence of subalpine fir habitat type were delineated to primary lynx habitat based on local wildlife and forest biologists' *opinion* that this classification provided a high *probability* of mature forest with a sufficiently dense understory of vegetation for lynx and snowshoe hares." FS005626 (emphasis added).  The Forest Service classified areas with greater than 50 percent subalpine fir probability as secondary lynx habitat.  *Id.*  Soil types and topography were assessed in the context of suitability for subalpine fir.  FS005627.  Based primarily upon this incomplete modeling (monitoring data was not compiled across the Plateau area in the deleted LAUs), the Forest Service removed several LAUs in the remapping process because they did not have enough suitable habitat, habitat that was defined solely by the percentage of subalpine fir probability.  FS005627, 5629.

There is no explanation for the assertion that subalpine fir alone can act as a proxy for snowshoe hare presence or lynx presence. Several documents describe what determines snowshoe hare habitat and lynx habitat and how these features should be assessed, most notably the NRLMD and the LCAS:

- Primary vegetation that contributes to lynx habitat is defined as habitat that provides for lynx foraging (snowshoe hare habitat) or lynx denning.  FS001825.
- Foraging habitat is defined as habitat that supports snowshoe hare.  *Id.*
- Winter snowshoe hare habitat occurs in three stages of forest development, the stand initiation, understory re-initiation, and old forest multistoried structural stages. *Id.*
- The typical vegetation for snowshoe hare and lynx habitat includes lodgepole pine, sub alpine fir, and Engelmann spruce. FS004695.
- These habitat elements are considered necessary for lynx foraging habitat because these elements can sustain snowshoe hare. FS001825.

The Forest Service's subalpine fir habitat proxy does not mirror reality.  *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv*., 378 F.3d. 1059, 1066 (noting that habitat proxies

must be evaluated to ensure that the results "mirror reality."). The Forest Service concludes, based upon local biologist opinion and probability modeling, that the area does not have enough subalpine fir to support snowshoe hare, and thus lynx, so thousands of acres of LAUs were removed based upon this conclusion. FS005626. In preparation of the Split Creek Project, the Forest Service completed one survey, a snow track survey, for snowshoe hare in the Project area that was limited to three months in one year. FS005645. Results were further limited by length of transects and monitoring time after snowstorms when tracks could be seen. *Id*. Through this very cursory sampling of snowshoe hare tracts in the Project area, the Forest Service found snowshoe hare tracks on at least 23% of the Project area. FS005645. The record does not disclose a percentage of areas supporting hares on the nearly 400,000 acres affected by the 2005 remapping of lynx analysis units. The record also does not appear to extrapolate the density of hare tracks in Project area transects where tracks were found. The Forest Service notes that 4 of the transects that demonstrated higher stand densities had hares in the highest numbers. FS011590. It appears from survey data that this means hare track densities showed 24 tracks within a transect that was 443 meters long, 18 tracks within a transect that was 477 meters long, 10 tracks within a transect that was 404 meters long, and 7 tracks in a transect that was 350 meters long. FS005642. Other transects showed between 2 and 5 tracks per transect. *Id*.

Although the Forest Service fails to discuss the significance of track density given the size of the transect units, other studies offer an indication of what hare densities mean at the hectare scale. Lynx subsist on lower population densities of hares in the southern portion of its range. FS013138; FS004598. The Seeley Lake area in Montana supports lynx at 0.53 hares/ha in mature dense forest, 0.2 hares/ha in mature open forest, 0.47 hares/ ha in young dense forest, and 0.12 hares/ha in young open forest. FS013194. Colorado snowshoe hare densities average up to

roughly 0.5 hares/ha. FS013152. Lynx are successfully reproducing in these areas.  FS013181.

Other studies show an average of 0.9 hares/ha in old closed forest, 1.9 hares/ha in closed young

forest, 0.6 hares/ha in old open forest, and 0.7 hares/ha in young open forest. FS013190.  Hare

densities in Wyoming ranged between 0.8 and 1.4 hares/ha in Dubois, Wyoming and 0.6

hares/ha in the Beartooth Mountains.  *Id.*  Yet another study reports hare densities in the Western

United States averaging 0.34 to 0.53 hares/ha in mature closed forest, 0.18 to 0.2 hares/ha in

mature open forest, 0.63 to 0.47 hares/ha in young dense forest, and 0.18 to 0.12 hares/ha in open

young forest. FS013194. Studies in the Rocky Mountains show hare densities at 0.73, 0.5, and

0.6 hares/ha. FS013206. Project documents in this case indicate that 0.5 hares/ha are required for

successful lynx reproduction. FS013224.  The hare densities that were disclosed for the CTNF

and the areas around the Project area are within this range and exceed this range in some

circumstances.  FS005619, FS005642.

   To justify the removal of LAUs, the Forest Service relied on programmatic planning

standards outlined in the LCAS that stated, "Lynx habitat will be mapped using criteria specific

to each geographic area to identify appropriate vegetation and environmental conditions.

Primary vegetation includes those types necessary to support lynx reproduction and survival."

FS003098; FS004672. Because the Forest Service failed to consider important habitat

characteristics in its habitat studies, because the Forest Service's habitat proxy for snowshoe hare

habitat does not mirror reality, and because there are numerous other studies indicating that

subalpine fir presence is not required for snowshoe hare use, the Forest Service failed to use the

best available science in the 2005 remapping of LAUs and in the authorization of the Project.

  **B.**  **Defendants' authorization of the 2005 Map and the Split Creek Project are
arbitrary and in violation of the ESA because Defendants failed to ensure that
the approval of the map and the Project would not destroy or adversely modify
lynx critical habitat.**

The ESA requires that "[e]ach Federal Agency shall [engage in consultation to]… insure that any action authorized, funded, or carried out by such agency … is not likely to result in the destruction or adverse modification of … [critical] habitat." 16 U.S.C. §1536(a)(2).  The Project area and the LAUs abandoned in the 2005 Map meet the criteria for critical habitat.  The Forest Service and Fish and Wildlife Service failed to consult and failed to ensure that the remapping of 390,900 acres of potentially critical habitat and the authorization of a precommercial thinning project within that area will not result in the destruction or adverse modification of critical habitat. Because of these failures, the approval of the 2005 Map and the authorization of the Split Creek Project (Project) are arbitrary and in violation of the ESA.

### 1.  Background - Critical Habitat Designation and Litigation

The FWS's critical habitat designation for the lynx is the result of over a decade of litigation. The ESA requires that the FWS determine critical habitat for a species at the time of its listing.  16 U.S.C. § 1533(b)(6)(C).  Critical habitat is defined by the ESA as "the specific areas within the geographical area occupied by the species, at the time it is listed …, on which are found those physical elements or biological features (I) essential to the survival of the species and (II) which may require special management direction." 16 U.S.C. § 1532(5)(A)(i). The FWS did not determine critical habitat for lynx at the time the species was listed.  Legal action ensued and the FWS was ordered to "undertake prompt rulemaking" in order to determine and designate lynx critical habitat.  *Defenders of Wildlife v. Norton*, 239 F.Supp.2d 9, 26 (D.D.C. 2002).

"On February 28, 2008, the Service issued the proposed rule designating lynx critical habitat.  The final rule was then published on February 25, 2009." *Alliance for the Wild Rockies v. Lyder*, 728 F.Supp.2d 1126, 1143 (D.Mont. 2010) (citing 74 Fed. Reg. 8616). The Final Rule laid out the "biological and physical features" essential to the survival of the species and

determined the "primary constituent elements" (PCEs) of lynx habit necessary for designation as critical habitat. 74 Fed. Reg. 8635.  These PCEs are:

> Boreal forest landscapes supporting a mosaic of differing successional forest landscape containing:
>
> a. Presence of snowshoe hares and their preferred habitat conditions, which include dense understories of young trees, shrubs or overhanging boughs that protrude above snow, and mature multistoried stands with conifer boughs touching the snow surface;
>
> b. Winter snow conditions that are generally deep and fluffy for extended periods of time;
>
> c. Sites for denning that have abundant coarse woody debris, such as downed trees and root wads; and
>
> d. Matrix habitat (e.g., hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) that occurs between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range. 74 Fed. Reg. 8636.

With the Final Rule, the FWS mapped lynx critical habitat across the United States. 74 Fed. Reg. 8661.  The FWS excluded many large areas from the map in the Final Rule, including the Project area and the Targhee Forest.  *Id*.  The Final Rule was challenged and ultimately ruled invalid as "arbitrary and capricious" because in determining what habitat was "critical" for lynx the FWS required evidence of reproduction. *Lyder*, 728 F.Supp. at 1132.  In its ruling the Court stated that "evidence of reproduction is a sufficient condition that assumes the existence of the primary constituent element.  It does not, however, mean that only areas with such evidence contain the element."  *Id.,* at 1134 (quoting 74 Fed. Reg. 8640).  The Court held that because the agency required evidence of reproduction for mapped critical habitat, the Final Rule was unlawful and that the agency must reevaluate and reissue a rule properly designating lynx critical habitat. *Lyder*, 728 F.Supp. at 1145.

The Plaintiffs in *Lyder* asked the Court to fashion a remedy that left the current Rule in place while it was remanded back to the agency for revision. *Lyder*, 728 F.Supp. at 1145. The Court's purpose in fashioning this equitable remedy was to prevent actions detrimental to lynx in known (and mapped) lynx critical habitat. The areas mapped as critical habitat in the Final Rule were mapped as such because there is evidence of breeding, which is unequivocally lynx critical habitat. However, the incompleteness of the current map should not be reason to expose other likely critical areas to detrimental impacts while the agencies attempt to determine what other areas should be included.

### 2.   ESA Violations

The ESA requires agencies to consult to ensure that any agency action will not destroy or adversely modify critical habitat. 16 U.S.C. 1536(a)(2). Areas that are not mapped in the Final Rule may contain critical habitat. This is what the agencies have been tasked with evaluating in order to bring the Final Rule into compliance with the ESA. *Lyder*, 728 F.Supp. at 1145. In the meantime, the agencies must ensure that actions located in areas outside the mapped critical habitat that may include the required habitat elements to qualify as critical habitat are not being destroyed or adversely modified in violation of the ESA. 16 U.S.C. 1536(a)(2).

In their motion opposing preliminary injunction Defendants argue that because plaintiffs in the *Lyder* case only challenged the critical habitat designation procedure for the Nez Pierce and Clearwater National Forests in Idaho, and did not challenge its application in the CTNF, the critical habitat assessment for the CTNF is still valid, even though the same procedure was applied in all three forests. Def. Mot. in Opp. at 12. This argument defies the intent of the ESA and the ruling in *Lyder*. The Court in *Lyder* held that the invalidated Rule would stay in place temporarily while the FWS worked to reissue a new Final Rule that complied with the ESA and

the requirements for designating critical habitat. 728 F.Supp.2d at 1145.  It did not state that only

the specific forests outlined in the *Lyder* case were to be reevaluated.  Furthermore, it requires

the agencies to reconsider all areas excluded from the mapping in Idaho and Montana due to a

lack of evidence of breeding. *Id.* at 1135. Designation of critical habitat under the criteria

deemed arbitrary by the court in *Lyder*, is arbitrary everywhere it is applied, including the CTNF.

Therefore there is no valid assessment of critical habitat, outside the areas mapped in the Final

Rule, on this Forest.

 The exclusion of the CTNF from critical habitat designation is arbitrary for two reasons.

First, although it is not required, there may be evidence of breeding. FS004801. Second, the

biological and physical features necessary for the survival of the species appear to be present in

the LAUs removed through the remapping process and in the Project area.

### a.   Breeding

 The Court in *Lyder* states that "[t]here is recognition that evidence of breeding provides

evidence that habitat contains the necessary elements for lynx conservation. … This means

evidence of reproduction is a sufficient condition that assumes the existence of the primary

constituent element." *Lyder*, 728 F.Supp. at 1134.  The Forest Service stated that there is

historical evidence of kittens on the Forest. FS004801.

### b.   "Occupancy" and lynx occurrences on the Targhee Forest

 The first element in determining whether an area is critical habitat is whether the area in

question was "occupied by the species, *at the time it is listed*." 16 U.S.C. §1532(5)(A)(i)

(emphasis added). Critical habitat may include an area not currently occupied by lynx but that

will be needed for its recovery. FS001598. The Project Area and the LAUs abandon in the 2005

Map are occupied habitat. In their brief opposing Preliminary Injunction, Defendants admit that

the project area is occupied lynx habitat as defined by the NRLMD. Def. Mot. In Opp. at 14.

Furthermore, the NRLMD states that *all* lynx habitat across a forest is deemed occupied when

"there are at least 2 verified lynx sightings since 1999, *or* any historical evidence of lynx

reproduction. FS001552. Here we have at least one and possibly both.

　　　Project documents show there have been 32 documented lynx occurrences within the

Targhee section of the CTNF boundary. FS005613. Table 1 shows that 2 of those occurrences

were on National Forest land in the Island Park subsection, 1 was on BLM land in the Island

Park subsection, and 4 occurrences were on National Forest land in the Centennial Mountains

subsection near the boundary of the Island Park subsection. *Id*. It further notes that there were

additional occurrences north and east of the Forest boundary in Montana and Wyoming. *Id*.

Although the Centennial Mountains subsection of the Targhee Forest had the highest number of

historical sightings (21 sightings), lynx detection hare-snare surveys have failed to yield any lynx

hits in this area.  *Id*.; FS005615.  The Forest Service notes that possible lynx tracks were found

during snow tracking surveys, including 4 possible lynx tracks in the Centennial Mountains

subsection and 2 possible lynx tracks in the Island Park subsection.  *Id*.  The snow tracking and

hare snare surveys were limited to only a few years and in particular sections of the Targhee

Forest.  FS005613-5615.  In addition to these survey results and historical detections of lynx, the

Forest Service lists four other visual sightings and/or track sightings on the Targhee Forest that

were deemed either confirmed, probable, or reliable FS005618.  In two of these instances, Forest

Service and Wildlife Service personnel had confirmed visual sightings of lynx.  *Id*.  In 2000 and

2001, a male radio-collared lynx was tracked making an annual trek through the Island Park

subsection of the Forest. *Id*.  Finally, between 1999 and 2007 Colorado released 218 wild-caught

lynx from Canada and Alaska into the state of Colorado. FS005392. In 2006, it was determined

that 4 of these lynx had traveled to the Greater Yellowstone area and become resident lynx. FS005217.  The Colorado lynx were radio collared and tracked. FS005400.  These lynx have been recorded around the Project area and the area removed from LAU protection.  *See* FS005414, FS005401.

> c.  *Principal biological and physical features necessary for survival*

The primary constituent elements necessary for lynx habitat are:

> a.  Presence of snowshoe hares and their preferred habitat conditions, which include dense understories of young trees, shrubs or overhanging boughs that protrude above snow, and mature multistoried stands with conifer boughs touching the snow surface;
>
> b.  Winter snow conditions that are generally deep and fluffy for extended periods of time;
>
> c.  Sites for denning that have abundant coarse woody debris, such as downed trees and root wads; and
>
> d.  Matrix habitat (e.g., hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) that occurs between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range. 74 Fed. Reg. 8636.

In a limited, cursory study of snowshoe hares tracks in the Project area, snowshoe hare were found on 23 percent of the transects. FS012227; FS005645. Biologists for the Forest Service determined that in the Island Park area, adjacent to the project area, most hare pellets were found in the un-thinned young lodgepole pine habitat, which is exactly the type of habitat exposed to thinning with the approval of the Project. FS004801.  There were 11 hares found on one grid in the Island Park study. FS005619.  There were also hare studies in the Stamp Meadows area where, again, they found the highest concentration of hares in the unthinned lodgepole pine stands, stands that notably did not display subalpine fir presence.  FS004801.

These unthinned lodgepole pine areas are exactly the type of habitat slated for precommercial

thinning in the Split Creek Project. FS011550.

Of the 1,134,770 acres of originally mapped LAUs, 645,049 of those acres were "primary

habitat" in a "suitable condition." FS004821. Of the 390,900 acres within the LAUs removed in

the 2005 map, 227,675 acres were considered primary habitat in a suitable condition, 56,952

acres are primary habitat in an unsuitable condition, and another 38,112 acres are secondary

habitat in a suitable condition. *Id.* PCEs 1,2, and 3 are habitats that demonstrate primary and

secondary habitat features, and PCE 4 is habitat that demonstrates linkage features, which is

notably included in critical habitat designations if found in close proximity to primary habitat. 74

Fed. Reg. 8636.

### d. *Requirement of special management direction*

The NRLMD provides specific management direction for lynx and snowshoe hare

habitat. There are several vegetation management standards prohibiting or limiting vegetation

treatments and precommercial thinning. FS005131-1534, FS001542. Vegetation standard 6

recommends no precommercial thinning that reduces snowshoe hare habitat in multi-story

forests. FS001536, 1537. Vegetation standard 5 protects winter snowshoe hare habitat from

precommercial thinning. FS001535, 1536. Vegetation standard 3 and 4 protect denning habitat

from salvage harvests. FS001537. Vegetation standards 1, 2, and 6 promote the structure

needed for denning habitat. FS001531, 1537.

The ESA requires that agencies ensure that agency action does not destroy or adversely

modify critical habitat. 16 U.S.C. §1536(a)(2). Thus, to comply with the ESA, the agencies

should have re-assessed the Forest for critical habitat to ensure that remapping of 390,900 acres

of lynx habitat and the authorization of precommercial thinning within the remapped areas does

not destroy or adversely modify critical habitat.  The failure to do so is a failure to consider an important aspect of the problem, and thus arbitrary, and in violation of the ESA.

C. **The agencies' failure to make a jeopardy determination for the 2005 map and its "May Affect, Not Likely to Adversely Affect" determination for the Project is arbitrary and in violation of the ESA.**

Section 7 requirements are very specific. "A federal agency proposing an action … must first determine whether the action "may affect" a listed species or critical habitat. … If the agency determines its proposed action "may affect" a listed species or critical habitat, it must then [engage in consultation.]" *Alliance v. Bradford*, 720 F.Supp.2d, at 1211.  Consultation can be formal or informal, but the end result of that consultation must be a determination of either "likely to adversely affect" or "not likely to adversely affect." *Id.* (citing 50 C.F.R. § 402.02, 402.12, 402.14, and 402.14(b)(1)).

Defendants' methods for determining critical habitat on the Forest have been found illegal.  *Lyder*, 728 F.Supp. 1126 (D. Mont. 2010).  It has not re-assessed the Forest for critical habitat and thus its determination that activities will not adversely affect critical habitat is arbitrary and in violation of the ESA.

1. **2005 map**

Defendants assert that the Section 7 consultation in the Biological Assessment for the NRLMD suffices as Section 7 consultation for the remapping because the NRLMD allows remapping of LAU boundaries. Defs' Mot. Opp. PI, at 12. However, nearly 400,000 acres of LAUs were wiped from the map. FS005603. This action is substantially more significant than a relatively minor boundary adjustment.  In conflict with its assertion that no additional review was needed, Defendants also assert that the Project was originally withdrawn to provide an opportunity for public review of the 2005 map, but the Project EA was limited in scope to site-

specific Project effects.  FS011552; FS011562.  Thus, the agencies tiered consultation to the

NRLMD and NEPA analysis to the Project thereby circumventing review for the 2005 map.  No

jeopardy determination was made for the 2005 map.  Any boot-strapped "not likely to adversely

affect" determination as it relates to the 2005 Map, if Defendants argue one was ever made, is

arbitrary and in violation of the ESA.  *Alliance v. Bradford*, 720 F.Supp.2d at 1211.

Further, agency collaboration for the remapping process is not sufficient under the ESA.

The ESA Specifically requires that the agencies determine whether the remapping would "likely

affect" lynx and if so, whether those impacts would be adverse. *Alliance v. Bradford*, 720

F.Supp.2d, at 1211. The meeting regarding the remapping did not address whether this process

would affect lynx, or whether the effects would be adverse.  The agencies' failure to make a

jeopardy determination regarding the removal of 390,900 acres from management protection

with the 2005 Map makes its authorization arbitrary and in violation of the ESA.  *Alliance v.*

*Bradford*, 720 F.Supp.2d at 1211.

### 2.  Project

The site-specific implementation of the map, the Split Creek Project, authorizes 7,000

acres of precommercial thinning in lynx habitat. FS012218. Precommercial thinning and timber

management pose a significant threat to lynx habitat and the survival of the species. FS001601;

FS001531-1541.  The agencies' conclusion that the Split Creek Project is "not likely to adversely

affect" the survival of the Canada Lynx is arbitrary and in violation of the ESA because it is

based on a series of inaccuracies. First, the Project utilizes the 2005 map that arbitrarily removed

the Project area from LAU management and delineated it as linkage habitat. FS011553. Second,

the Biological Assessment determined that there will be no harm to lynx because there are

currently no breeding lynx in the Project area. FS005691. However, the historical presence of

breeding lynx anywhere on the forest is enough to establish occupied habitat for the species. FS001587. There may be historical evidence of lynx breeding on the CTNF, and the project area "may support reproductive lynx at other times of life cycle." FS004802. Third, as argued above, the Biological Assessment and the 2005 map it relies upon are based upon poor science that fails to consider important aspects of the problem. In concluding that the Project "may Affect, Not likely to Adversely Affect" the threatened lynx, the agencies "relied on factors which Congress has not intended it to consider, entirely failed to consider … important aspect[s] of the problem, [and] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

Because the Project is based on an illegal map that arbitrarily depicts the level of protection necessary, the type of habitat involved, and the likelihood of lynx and snowshoe hare in the area, the Biological Assessment does not accurately assess how the Project will impact lynx survival and critical habitat in violation of the ESA. *Alliance v. Bradford*, 720 F.Supp.2d at 1212-1215 (determining that the Forest Service's "not likely to adversely affect" was arbitrary due to an inaccurate assessment of the likelihood of the presence of bears in the project area, and a failure to "articulate a rational connection between the nature and extent of helicopter logging … and their determination that the logging is not likely to adversely affect grizzly bears.")

The agencies have failed to ensure that the actions will not adversely modify occupied critical lynx habitat and failed to ensure the Project will not jeopardize the survival of the species. Approval of the Project is therefore arbitrary and in violation of the ESA. *Motor vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983), *Alliance v. Bradford*, 720 F.Supp.2d at 1211, 50 C.F.R. § 402.14.

## III.  NFMA VIOLATIONS

A. **The Forest Service violated NFMA and NEPA by authorizing the 2005 map which changed highly protected LAUs to linkage habitat and by subsequently authorizing the site-specific Project.**

NFMA requires each National Forest to develop a "Land and Resource Management Plan" (i.e. a forest plan). 16 U.S.C. § 1604 (d). The "Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005)(citing 16 U.S.C. §1604(i) and cases).

In 2007, the Forest Service adopted the NRLMD.  FS001524. The Record of Decision to the NRLMD amended the directives of the NRLMD into all Forest Plans in the planning area. *Id.* In 2009 the CTNF, through adoption of the 2005 map, approved the removal of 8 LAUs and nearly 400,000 acres of occupied habitat from restrictive management protections and instead designated it as linkage habitat. FS005603.  The agencies rely on direction Standard LAU S1 as justification for the removal of LAUs. FS011557. Standard LAU S1 states, "Changes in LAU boundaries shall be based on site-specific habitat information and reviewed by the Forest Service Regional Office." *Id.* This Forest Plan Standard allows for changes in LAU boundaries, not the entire removal of 8 LAUs from protection, particularly without any independent NEPA analysis.

The arbitrary remapping of LAUs as linkage habitat violates the CTNF Plan. The "Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 961 (9th Cir. 2005)[Council](citing 16 U.S.C. §1604(i) and cases).

1. **The Forest Service violated NFMA and NEPA with the authorization of the 2005 map and the Project because the 2005 map arbitrarily removed LAUs from the Forest and the Project violates Vegetation standards designed to protect those LAUs.**

A forest plan is implemented through site-specific actions.  *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1376 (9th Cir. 1998).  Individual, site-specific

projects must comply both with NFMA and the Forest Plan.  16 U.S.C. § 1604 (i); *Idaho Sporting Cong. Inc. v. Rittenhouse*, 305 F.3d 957, 961-962 (9th Cir. 2002). Where the alleged violation of NFMA pertains to the procedural requirements that Forest Service must adhere to in ensuring species viability, a NEPA violation can be found based on a violation of NFMA. *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th  Cir. 2010)("Just as the methodology applied by the Forest Service to measure habitat conditions did not meet the NFMA requirements, its flawed methodology … does not constitute the requisite 'hard look' mandated by NEPA.")(citing *Native Ecosystems Council*, 418 F.3d at 964-965).

The Forest Plan requires the Forest Service to manage lynx habitat according to NRLMD standards.  FS001524. The standards set forth in the Forest Plan for management of vegetation in LAUs are strict and severely limit the opportunity for precommercial thinning in snowshoe hare habitat.  FS001577-1579.  The Forest Service did not address any vegetation standards in the EA because it illegally asserted that the Project area was not in an LAU. FS011593.  Because the Forest Service arbitrarily removed, without NEPA analysis and under flawed scientific analysis, 8 LAUs from the area, it also arbitrarily failed to apply LAU management direction as required by the Forest Plan.

Vegetation Standard S1 prohibits vegetation treatment projects in areas where more than 30 percent of the lynx habitat in an LAU is in a stand initiation structural stage (except in very specific circumstances). FS001577-1578. Vegetation Standard S2 prohibits timber projects on more than 15 percent of lynx habitat on NFS lands within a LAU in a ten-year period. FS001578. Vegetation Standard S6 prohibits vegetation management projects that reduce snowshoe hare habitat in multi-story mature or late successional forests (except in very specific circumstances). FS001579.

Vegetation Standard S5 prohibits precommercial thinning projects to the degree that an

area can no longer support snowshoe hare (except in very specific circumstances). FS001578-

1579. This Project proposes to implement 7000 acres of precommercial thinning in occupied,

possibly critical habitat. FS011550. There are at least two studies showing presence of snowshoe

hare in habitat across the CTNF (FS005605; FS005086; FS004728) and a third study showing

that there were snowshoe hare in reasonably high densities on 23% of the transects studied in the

actual Project area. FS005645. This project will occur in occupied habitat currently supporting

snowshoe hare.

In occupied lynx habitat the NRLMD mandates clear protection of lynx and snowshoe

hare habitat. FS001524. This Project proposes to implement 7,000 acres of precommercial

thinning in occupied, possibly critical habitat.  FS011550.  This is justified by remapping the

area as linkage habitat, which allows precommercial thinning. As a result, the Split Creek

Environmental Assessment does not assess whether the thinning project can comply with

Standard VEG S1, VEG S2, VEG S5, or VEG S6.   The 2005 map arbitrarily removed the area

from LAU management protection and the Project will likely violate standards VEG S1, VEG

S2, VEG S5, and VEG S6.  A violation of any one of these standards is a violation of NFMA.

*Native Ecosystems Council v. U.S. Forest Service,* 418 F.3d 953, 961 (9th Cir. 2005).  The

failure to assess and discuss these standards is a violation of NEPA's mandate to take a hard look

at agency activities.  See *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th  Cir.

2010).

   2.  **The Forest Service violated NFMA and NEPA by failing to address Forest Plan
       Standard ALL S1 of the Northern Rockies Lynx Management Direction**.

Even if the Court decides that the Forest Service was not obligated to assess Project compliance

with LAU standards, the Forest Service still failed to mention or discuss Standard ALL S1 of the

Northern Rockies Lynx Management Direction that requires the Forest Service to ensure that "vegetation management projects … maintain habitat connectivity in an LAU and/or linkage area." FS002199.  There is no mention in the Project record concerning this standard, nor is there a discussion detailing how the agency's activities will meet this standard.  The Forest Service is violating NFMA when a court cannot determine from the record that the Forest Service is complying with forest plan standards.  *NEC*, 418 F.3d at 962, 963 (holding that the Forest Service violates NFMA when a court cannot "determine from the record that the agency is complying with the forest plan standard").  The Forest Service is violating NEPA and the APA when it fails to disclose an important piece of information.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court grant their motion for summary judgment and the relief requested in their Amended Complaint.

Submitted this 7th day of November, 2011.


_____/s/_____

Dana M. Johnson
Law Office of Dana Johnson, PLLC

K.E. Purcie Bennett
Cottonwood Environmental Law Center

Attorneys for Plaintiffs

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 7, 2011, I electronically filed the foregoing BRIEF IN
SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT with the Clerk of the
Court via the CM/ECF system, which will provide service on all counsel of record.

<u>/s/ Dana M. Johnson</u>
Dana M. Johnson
Attorney for Plaintiffs
