UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL & ALLIANCE FOR THE WILD ROCKIES,<br><br>                    Plaintiffs,<br><br>        v.<br><br>UNITED STATES FOREST SERVICE, acting by and through Ashton/Island Park District Ranger on the Caribou-Targhee National Forest ELIZABETH DAVEY, HARV FORSGREN, REGIONAL FORESTER for Region 4 of the Unites States Forest Service, UNITED STATES SECRETARY OF THE INTERIOR KEN SALAZAR, & UNITED STATES FISH & WILDLIFE SERVICE, acting by and through Acting Director Rowan Gould,<br><br>                    Defendants. | Case No. 4:11-cv-00212-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

In 2005, the United States Forest Service adopted a revised map delineating

analysis units for the Canada lynx within the Caribou-Targhee National Forest. The

Canada lynx is listed as a threatened species under the Endangered Species Act and the

**MEMORANDUM DECISION AND ORDER - 1**

land within the boundaries of Lynx Analysis Units ("LAUs") is subject to various restrictions, including a prohibition on precommercial thinning of trees. The 2005 map eliminated eight LAUs located within the Caribou-Targhee National Forest and removed approximately 400,000 acres of land previously subject to the restrictions applicable to LAUs.

In December of 2009, the Forest Supervisor for the Caribou-Targhee National Forest authorized the Split Creek Precommercial Thinning Project (the "Split Creek Project" or "Project"). The Project authorized the precommercial thinning of approximately 7,000 acres of lodgepole pine located within the Island Park and Madison-Pitchstone Plateaus Subsections of the Caribou-Targhee National Forest. The Forest Service prepared an Environmental Assessment for the Project under the National Environmental Policy Act ("NEPA") and a Biological Assessment of the potential affects of the Project on the Canada lynx and its habitat under the Endangered Species Act ("ESA").

In its review under NEPA, the Forest Service concluded that the Project "will not have a significant effect on the quality of the human environment" and that the preparation of a more detailed Environmental Impact Statement was not necessary. (Administrative Record 12225.)[1] In its review under the ESA, the Forest Service

---

[1] The administrative records underlying the agencies' decisions on appeal were lodged with the Court on three compact discs. The records are numbered "FS ####" or "FWS ###" depending upon whether the records were before the Forest Service or the Fish and Wildlife Service. The Court will use the designation "AR" for all "FS"

concluded that the Project "may affect, but is not likely to adversely affect" the Canada

lynx or its habitat. (AR 5691.) Both analyses rely heavily on the 2005 map and the fact

that the Project area is not within an LAU. Prior to its use as a justification for the

authorization of the Split Creek Project, the 2005 map had not been analyzed under

NEPA.

Based upon these findings, the Project commenced on July 8, 2010, and the Forest

Service thinned approximately 1,350 acres of lodgepole pine.  Year two of the Project

commenced in August of 2011, and it was anticipated that approximately 2,400 acres of

lodgepole pine would be thinned. The Project is scheduled to continue each season until

the full 7,000 acres are thinned.

On May 11, 2011, Native Ecosystems Council and the Alliance for the Wild

Rockies ("Plaintiffs") – non-profit organizations dedicated to the conservation and

preservation of natural resources and biodiversity in the Northern Rockies – filed an

action against the United States Forest Service, the United States Fish and Wildlife

Service ("FWS"), Secretary of the Interior Ken Salazar, and various other federal

employees associated with these agencies (collectively "Defendants").[2] (Dkt. 1.)

---

numbered records and "AR FWS" for all records originally designated "FWS."

[2] Plaintiffs also name Elizabeth Davey (the Ashton/Island Park District Ranger for the Caribou-Targhee National Forest), Harv Forsgren (the Regional Forester for Region 4 of the United States Forest Service), and Dan Ashe (Director of the United States Fish and Wildlife Service).

**MEMORANDUM DECISION AND ORDER - 3**

Plaintiffs challenge two actions taken by Defendants. First, Plaintiffs challenge the Forest Service's authorization of the Split Creek Project. Plaintiffs contend that the Project is detrimental to the habitat of the Canada lynx, and by extension to the lynx itself. Second, Plaintiffs challenge Defendants' adoption of the 2005 LAU map, arguing that the map should have been subjected to NEPA review and that the failure to do so undermines the agency decisions related to authorization of the Project, which rely on the map. Plaintiffs argue that the approval of the 2005 map and the authorization of the Project violated NEPA, 42 U.S.C. § 4331 *et seq.*, the ESA, 16 U.S.C. § 1531 *et seq.*, and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*

Before the Court are the parties' cross-motions for summary judgment. *(Pl.s' Mot. for Summ. J.*, Dkt. 45; *Def.s' Cross-Mot. for Summ. J.*, Dkt. 46.) A hearing on the parties' motions was held on February 28, 2012. Having fully considered the parties' briefing and arguments, and having reviewed the voluminous administrative record and the applicable legal authorities, the Court finds that the Forest Service's failure to prepare an Environmental Impact Statement for a decision that ultimately opened approximately 400,000 acres of previously protected land to precommercial thinning violated NEPA. Moreover, like a house of cards built on an unsound foundation, because the 2005 map was not analyzed under NEPA, the agency's analysis under the ESA – which is based upon the validity of the 2005 map – cannot withstand judicial review. Based on the above, and as more fully explained below, Plaintiffs' motion for summary judgment will be granted in part, the Split Creek Project will be enjoined, and the case will be remanded

**MEMORANDUM DECISION AND ORDER - 4**

to the agencies for further proceedings consistent with this Memorandum Decision and

Order.

## FACTUAL AND PROCEDURAL BACKGROUND

1.    **Designation of the Canada Lynx as a Threatened Species and Mapping of Lynx Habitat**

On March 24, 2000, the FWS added the Canada lynx (*Lynx canadensis*) to the list

of threatened species under the Endangered Species Act. 65 Fed. Reg. 16052-1, 2000 WL

299328. Following nearly a decade of analysis, the agency determined that the lynx

population of the continental United States was threatened by "the lack of guidance for

conservation of lynx and snowshoe hare habitat in the National Forest Land and Resource

Plans." (AR 1524.) The FWS concluded that "it is imperative that lynx habitat and habitat

for lynx prey [primarily snowshoe hare] be maintained and conserved on Federal lands."

65 Fed. Reg. 16051-01.

In 2000, an interagency lynx biology team, which consisted of biologists from the

Forest Service, the FWS, the Bureau of Land Management, and the National Park

Service, developed the Canada Lynx Conservation and Assessment and Strategy

("LCAS") as an interim and guiding conservation strategy for lynx on federal lands. (AR

5307-5309.) The LCAS required the Forest Service and the FWS to delineate LAUs

"upon which direct, indirect, and cumulative effects" from site-specific projects could be

analyzed. (AR 4695-96.) "An LAU is an area of at least the size used by an individual

lynx, from about 25 to 50 square miles[,]" (AR 1591), and must contain "at least 10

square miles of primary [lynx habitat to support reproduction and survival]." (AR 4672-73.) According to the LCAS, LAUs were "not intended to depict actual lynx home ranges, but are intended to provide analysis units of the appropriate scale with which to begin the analysis of potential direct and indirect effects of projects or activities on individual lynx, and to monitor habitat changes."

In 2001, the Forest Service and the FWS delineated LAUs for the Island Park and Centennial Mountain areas of the Caribou-Targhee National Forest ("C-TNF").[3] (AR 4820.) The parties refer to this as the 2001 map. The 2001 map depicts several LAUs within the C-TNF, including what would become the Split Creek Precommercial Thinning Project area. Of the total 1,134,779 acres within the boundaries of an LAU in the forest, 645,049 acres were considered primary suitable habitat, 126,795 were secondary suitable habitat, 98,554 were primary unsuitable habitat and 8,565 were considered secondary unsuitable habitat. (AR 4821.) The 2001 map also identifies LAUs within the project area containing "primary" lynx habitat. (*Id*.)

During this same time period, the Forest Service and the FWS entered into a Lynx Conservation Agreement in the year 2000.  The agreement served as a framework for lynx conservation within mapped lynx habitat on national forests and was revised in 2005 and again in 2006 to implement the standards and guidelines in the LCAS until formal management could be implemented.

---

[3] The Project is located in the Island Park area of the C-TNF.

**MEMORANDUM DECISION AND ORDER - 6**

In 2005, as contemplated by the LCAS, the agencies revised the LAU designations in the Island Park and Centennial Mountain areas. (AR 3098, 5675.) According to the FWS, "[a]s new information became available (including information on habitat quality, snowshoe hare studies, and habitat mapping), it became necessary to refine the [original] LAU map," and in 2005, the Forest Service developed a revised LAU map for the Island Park and Centennial Mountain area. (AR 5697.) In the revision process, the agencies used a habitat model that predicted the probability of moist subalpine fir habitat in the Island Park and Centennial Mountain areas. (AR 5623-28.) The habitat model used a topographic methodology (evaluating elevation, slope, soil, etc.) that allowed the agencies to more accurately separate the moist subalpine fir habitat (which the agencies previously found to be primary lynx habitat) from the dry subalpine fir habitat types (which the agencies previously found were not associated with primary lynx habitat). (AR 5623-27.)

When this habitat model was applied to the Island Park and Centennial Mountain areas, the agencies found that the occurrence of moist subalpine fir habitat in the 2001 LAU map had been significantly overestimated. (AR 5623) ("estimated occurrence of [moist] subalpine fir habitat type [in the Island Park area] was considerably (>30%) less than previously mapped."). Based on the results of the habitat model, the agencies revised the locations of moist subalpine fir habitat types in the areas and determined that many of the 2001 LAUs, especially in the Island Park area, contained less than the required 10 square miles of moist subalpine fir habitat. Ultimately, the 2001 map was revised, and the revised map – the 2005 map – proposed to drop eight LAUs within the Island Park

**MEMORANDUM DECISION AND ORDER - 7**

Subsection and Madison-Pitchstone Plateaus Subsection of the CTNF. (AR 4821.) The

2005 map removed 390,900 acres from the 2001 map. (AR 5608.)

In 2007, the Forest Service adopted the Northern Rockies Lynx Management

Direction (the "Lynx Management Direction"), which set forth goals, standards, and

guidelines for all LAUs. (AR 1520.)  The Lynx Management Direction superceded the

interim Conservation Agreement between the Forest Service and the FWS, including the

2005 and 2006 revisions. It also amended the Forest Plans for the Caribou-Targhee

National Forest and incorporated lynx conservation guidelines into those plans. (AR

1524.)

The Lynx Management Direction sets forth several objectives, standards, and

guidelines applicable "to all management projects in lynx habitat in lynx analysis units

(LAUs) in occupied habitat and in linkage areas."[4] (AR 1576.) Vegetation Standard S1

prohibits vegetation treatment projects "[i]f more than 30 percent of the lynx habitat in an

LAU is currently in a stand initiation structural stage that does not yet provide winter

snowshoe hare habitat." (AR 1577.) Vegetation Standard S2 prohibits timber projects on

"more than 15 percent of lynx habitat on [Forest Service] lands within an LAU in a ten-

_____

[4] The Lynx Management Direction provides a definition of lynx habitat and
identified the vegetation characteristics that contribute to lynx habitat.  It retained the
definition of "occupied habitat" implemented by the 2006 revisions to the Conservation
Agreement and included a map, based on the 2006 revisions, that displayed occupied and
unoccupied lynx habitat located within the Northern Rockies Lynx Planning Area.  The
Split Creek Pre-Commercial Thinning Project is located within an area designated
"occupied."

**MEMORANDUM DECISION AND ORDER - 8**

year period." (*Id.*) Vegetation Standard S5 specifically addresses pre-commercial thinning projects and prohibits such activity in areas within LAUs except in limited enumerated circumstances.[5] And Vegetation Standard S6 prohibits vegetation management projects that reduce snowshoe hare habitat in multi-story mature or late successional forests except in limited enumerated circumstances. (AR 1579.)

The Forest Service has not assessed whether the Split Creek Precommercial Thinning Project complies with the above standards because, based on the 2005 map, there are no LAUs within the Project area and the standards apply to lynx and snowshoe

---

[5] Standard VEG S5 provides:

Precommercial thinning projects that reduce snowshoe hare habitat may occur from the stand initiation structural stage until the stands no longer provide winter snowshoe hare habitat only:
1.  Within 200 feet of administrative sites, dwellings, or outbuildings; or
2.  For research studies or genetic tree tests evaluating enetically improved reforestation stock; or
3.  Based on new information that is peer reviewed and accepted by the regional level of the Forest Service, and state level of FWS, where a written determination states:
    a. that a project is not likely to adversely affect lynx; or
    b. that a project is likely to have short term adverse effects on lynx or its habitat, but would result in long-term benefits to lynx and its habitat; or
4.  For conifer removal in aspen, or daylight thinning around individual aspen trees, where aspen is in decline; or
5.  For daylight thinning of planted rust-resistant white pine where 80% of the winter snowshoe hare habitat is retained; or
6.  To restore whitebark pine.

*Exceptions 2 through 6 shall only be utilized in LAUs where Standard VEG S1 is met.*

(AR 1578-79) (italics in original).

**MEMORANDUM DECISION AND ORDER - 9**

hare habitat only within LAUs.

**2.     Events Leading to Approval of the Split Creek Project**

The Split Creek Project was approved originally by the Forest Service in

December of 2007 and relied on the 2005 map, which had not yet been approved by the

Regional Forester. (AR 3028.) After receiving objections to the use of a map that had not

been exposed to public comment, the Forest Service withdrew the project in August of

2008 to provide notice and comment on both the 2005 map and the Project. The Project

was "withdrawn on July 28, 2008 to provide an opportunity for public notice and

comment on both the pre-commercial thinning proposal and on the Caribou-Targhee

National Forest (C-TNF) updated Lynx Analysis Unit mapping for the Canada Lynx."

(AR 11552.)

In February of 2009, Forest Service staff proposed the approval and adoption of

the 2005 map to the Regional Forester. (AR 5604.) The 2005 LAU map made significant

changes to the 2001 LAU map, including the removal of several LAUs.  These changes

were made pursuant to "Standard LAU S1" set forth in the Lynx Management Direction,

which provides that "[c]hanges in LAU boundaries shall be based on site-specific habitat

information and reviewed by the Forest Service Regional Office." (AR 1576.) Neither an

Environmental Assessment nor an Environmental Impact Statement was completed for

the 2005 map.

According to the Forest Service, the changes to the 2001 LAU map were made

based on the following information: LAU mapping direction contained in the LCAS; the

**MEMORANDUM DECISION AND ORDER - 10**

history of lynx occurrence information contained in the Ecology and Conservation of

Lynx in the United States; recent lynx occurrence information gathered from the national

lynx detection surveys (commonly referred to as lynx hair-snare grids), reported

observations, and one radio-collared lynx; two snowshoe hare studies completed on the

Caribou-Targhee National Forest; information and recommendations from the July 2003

Lynx Interagency Coordination Meeting held in Island Park Idaho; new vegetation

analysis done on BLM and National Forest lands in the Centennial Mountains and Plateau

area; and a second evaluation of vegetation in the Caribou Range Overthrust Mountain

Ecological Subsection. (AR 83-84.)

In response to the Caribou-Targhee National Forest's proposed adoption of the

2005 LAU map, the Regional Forester made the following comments:

> As per your request, the Region 4 Wildlife staff reviewed
> your 2005 revision of the Caribou-Targhee National Forest
> Lynx Analysis Unit (LAU) Map.  The LAU map and the
> process used to develop it are consistent with direction
> contained in the Northern Rockies Lynx Management
> Direction (NRLMD) and concepts outlined in the Lynx
> Conservation Assessment and Strategy.  It is our expectation
> that the Forest will use this new map to implement
> requirements of the NRLMD and will serve as the reference
> for mapped Lynx habitat on the Forest.  We recognize that the
> 2005 LAU map represents more recent analysis of lynx
> habitat than that contained in Figure 1-1 of the NRLMD.
> Also, we recognize that Figure 1-1 in the NRLMD was never
> intended to accurately depict mapped lynx habitat at the forest
> scale.

(AR 5684-85.) In April of 2009, the proposal was approved by Regional Forester Harv

Forsgren. (AR 5603.) In December of 2009, the CTNF Forest Supervisor authorized the

Split Creek Project. (AR 12218.)

**3.     The Split Creek Project**

The Project authorized the precommercial thinning of approximately 7,000 acres

of lodgepole pine (with a minor amount of aspen, Douglas-fir and subalpine fir) located

within the Island Park and Madison-Pitchstone Plateaus Subsections of the Caribou-

Targhee National Forest. (AR 5663.)  "Approximately 2,000 - 4,000 acres are proposed to

be thinned each year starting in 2010, depending on funding." (*Id.*)  "The areas identified

to be thinned are past harvest units primarily composed of stands of lodgepole pine with

500 - 13,000 trees per acre [and] [t]he lodgepole would be thinned to a residual density of

approximately 360 trees per acre." (*Id.*)

The FWS summarized the purpose of the Project as follows:

> The purpose of the Split Creek Project is to improve overall
> stand health.  The high tree density in the Split Creek Project
> area results in less vigorous growth, which can eventually
> lead to a stagnant forest.  The high level of competition
> between the trees in the stand causes the trees to shed their
> lower branches (self pruning), the tree crowns become very
> thin, and the tree diameters remain small.  Thinning of the
> stands would result in retention of lower live limbs, which
> provides hiding cover for many wildlife species.  Thinning
> would also result in less competition, which results in better
> crown development and faster and bigger diameter growth,
> providing more suitable habitat for cavity nesting birds, and
> larger limbs for forest raptors to build nests.  Additionally,
> large tree crowns provide more cone production for natural
> regeneration and food for species that utilize conifer seed.

(AR 5696-97.)

**MEMORANDUM DECISION AND ORDER - 12**

Logistically, contract crews using chainsaws have been thinning the trees in the

Project area.  There is to be no new road construction or reconstruction.  Trees that are

felled are to be left on site, and, therefore, there are no ground disturbing activities due to

machine piling or skidding. (AR 5696.) Year one of the Project commenced on July 8,

2010, and the Forest Service thinned approximately 1,350 acres of lodgepole pine.  Year

two of the Project commenced in August of 2011, and it was anticipated that

approximately 2,400 acres of lodgepole pine would be thinned.

**4.      Biological Assessment under the ESA**

In evaluating whether to approve the Project, pursuant to Section 7 of the ESA, the

Forest Service determined that the Project "may affect" the lynx, and therefore consulted

with the FWS before authorizing the Project. As part of the consultation, the Forest

Service prepared a Biological Assessment for the lynx. (AR 5660.) The Biological

Assessment was issued on July 22, 2009, and addressed the potential effects of the Project

on the lynx and its habitat, including snowshoe hare habitat.  In evaluating the potential

adverse effects of the Project on the lynx, the Forest Service noted the following

observations in the Biological Assessment: for the time period between 1874 through

2005, only one radio-collared male lynx crossed the Project area during the summers of

2000 and 2001 (AR 5669); no lynx tracks have been documented on any established

winter snow tracking routes from 2005 to the present (*id*.); there are no resident

reproducing lynx in the C-TNF (AR 5671); since 2005, winter snow tracking routes,

including one in the Project area have demonstrated no verified or possible lynx tracks

**MEMORANDUM DECISION AND ORDER - 13**

(AR 5669); and during the winter of 2009, the Forest Service positioned 40 winter snow tracking routes within the Project area and did not observe any lynx or lynx tracks on any route. (AR 5671.)  Based on these observations, the Forest Service acknowledged the possibility of an individual lynx moving through the Project area, but found that, in the event of this unlikely scenario, the lynx would be displaced only (required to move around the area) and no lynx mortality would result. (*Id.*)

The Forest Service also considered the potential effects the Project would have on lynx habitat, as distinct from the potential effects on the lynx itself.  The Biological Assessment notes that the Project area is not located within habitat designated "critical" by the FWS under the ESA. (AR 5663.)  The Biological Assessment also emphasizes that the Project area is not located within any designated LAUs. (AR 5688.)  The physical characteristics of the Project area also were assessed and found not to be the type associated with lynx habitat. (AR 5680) (noting that the "lodgepole pine forests in this area grow on coarse volcanic soils that are well drained . . . , do not develop understories of subalpine fir . . . [and] Lynx do not appear to be associated with dry forest habitat types.").

Similarly, because the snowshoe hare composes the main diet of the lynx, and the habitat of the hare has been directly tied to the habitat of the lynx, the Forest Service also examined the potential effects of the Project on snowshoe hare habitat. (AR 5689.) According to the Forest Service, between January 2009 and March 2009, a total of 40 transects were established within the proposed thinning units for the purpose of

**MEMORANDUM DECISION AND ORDER - 14**

documenting the presence of the lynx. (*Id.*)  No lynx were documented, but the transects

did produce information on the presence of other wildlife species, including the snowshoe

hare. (*Id.*) These winter tracking routes demonstrated what the Forest Service

characterizes as a relatively low presence of snowshoe hare in the project area; snowshoe

hare were found on 9 of the 40 of the transects. (*Id.*)  Out of the nine transects that noted

the presence of the hare, four indicated high densities and five indicated low densities of

tracks. (AR 5689-90.)

It also was noted that the data obtained from the snow tracking analysis was

consistent with previous snowshoe hare research done in the C-TNF. (AR 5690.)  More

specifically, previous research "found that hares occur in reasonably high concentrations

when stand conditions are exactly right[,]" but based upon the characteristics of the

Project area, the Forest Service concluded that "while some stands in Island Park can

produce hares at densities similar to those observed in the Seeley Lake area (an area

known to support lynx [in Montana]), these stands will remain scattered, and will only

constitute a small proportion of the landscape." (*Id.*)

Based on the above findings, the Forest Service determined that the Project was

"not likely to adversely affect" the lynx or its habitat (AR 5691), and requested a

concurrence from the FWS. (AR 5659.)  It is clear from the Biological Assessment that

the Forest Service relied heavily on the 2005 map – the very first reason for the Forest

Service's conclusion is that "The Split Creek precommercial thinning project area is not

within a LAU; therefore, no lynx habitat will be affected by the project." (*Id.*) The

**MEMORANDUM DECISION AND ORDER - 15**

document further states that "[m]anagement direction prohibiting precommercial thinning in a LAU is not applicable to this project because the project area is not within a LAU." (*Id.*)

On August 11, 2009, after reviewing the Forest Service's Biological Assessment, the FWS concurred with the finding that the Project was "not likely to adversely affect" the Canada lynx. (AR 5696.)  The FWS listed several reasons for its concurrence, including: lynx occurrences in the Project area were historically rare and "extremely unlikely" (AR 5697-98); no documented reproducing lynx occurred within the Project area (AR 5697); the Project area is not located within any designated critical habitat or within any LAUs; while the Project does occur within linkage habitat, "all management direction applicable to linkage areas will be met" (*id.*); and, winter snow tracking transects in the Project area "revealed that snowshoe hares, which make up the majority of a lynx's diet, were not present on 31 of the 40 transects surveyed." (AR 5698.)  The FWS concluded:

> Based on the information provided in the Assessment, the cooperation and coordination between the Service and Forest while developing the Canada lynx LAU maps for the Forest, the two streamlining meeting (in March 2007 and March 2009) to discuss the Split Creek Project, and the meeting on July 6, 2009 also to discuss the Split Creek Project, the Service concurs with the Forest's determination that the proposed Split Creek Project may affect, but is not likely to adversely affect Canada lynx.

(AR 5698.) The concurrence also states that: "[t]he 2005 LAU map is the best scientific information available for Canada lynx habitat in the Split Creek Project area . . . . As

**MEMORANDUM DECISION AND ORDER - 16**

such, per the 2005 LAU map, the Split Creek Project area does not occur within an LAU; therefore, no lynx habitat will be affected by the Split Creek Porject. Any management direction precluding the use of precommercial thinning in a LAU is therefore not applicable, and precommercial thinning is authorized by the Forest for the Split Creek Project area. The Split Creek Project does occur within linkage habitat, all management direction applicable to linkage areas will be met with the Split Creek Project." (AR 5697.)

**5.    Environmental Assessment under NEPA**

NEPA requires an agency to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Federal regulations allow an agency to conduct an environmental assessment ("EA") to determine whether an EIS is required. 40 C.F.R. § 15024. The EA should "be a 'concise public document' that 'briefly provides sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757-58 (2004); 40 C.F.R. § 1508.9(a). NEPA's mandate is "essentially procedural." *Vt. Yankee nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). "It is to insure a fully informed and well-considered decision." *Id.*

In December of 2009, the Forest Service issued an Environmental Assessment for the Split Creek Precommercial Thinning Project. (AR 11548.) The EA states that it was prepared by the Forest Service in compliance with NEPA and "discloses the direct, indirect, and cumulative environmental impacts that would result from the proposed

**MEMORANDUM DECISION AND ORDER - 17**

action and no action alternative." (AR 11552.) The EA is much broader in scope than the

Biological Assessment, and addresses not just the effects of the Project on the lynx and its

habitat, but also a variety of other environmental concerns.[6]

In the background section of the EA, the Forest Service sets forth a history of the

LAU mapping process and how the agency relied on the 2005 map. (AR 11553.) The

discussion – which includes an overview of the LCAS, the Lynx Conservation Agreement

from 2000, the standards governing LAUs under the LCAS and the 2000 Conservation

Agreement, and a discussion of the Lynx Management Direction – takes up a total of five

pages.[7] (AR 11553-11557.) The summary of the adoption of the 2005 map itself takes up

a little more than one page. (AR 11556-57.) The EA states that, "[i]n April 2009 the

Regional Office completed their review of the 2005 map to be in compliance with the

Standards and Guidelines for the Northern Rockies Lynx Management Direction." (AR

11557.)

Ultimately, the EA concludes that implementation of the Project "may affect, but

is not likely to adversely affect lynx or lynx habitat." (AR 11593.) The EA sets forth

seven bullet point justifications for this finding, which were taken from the Biological

Assessment. The first bullet point states:

---

[6] These include, *inter alia*, "[c]hanges in secure habitat, food resources for the grizzly bear," "[r]eduction in acres of elk hiding cover," and "[c]hanges in hunter densities and motorized access route densities." (AR 11574.)

[7] The EA spans 61 pages, excluding Appendices. (AR 11548-11609.)

**MEMORANDUM DECISION AND ORDER - 18**

> The Split Creek precommercial thinning project area is not within a LAU, therefore, no lynx habitat will be affected by the project. Management direction prohibiting precommercial thinning in a LAU is not applicable to this project because the project area is not within a LAU.

(AR 11593.) On December 16, 2009, the Forest Service issued a Decision Notice & Finding of No Significant Impact ("FONSI"). (AR 12218.) The FONSI states that, "[a]fter considering the environmental effects described in the EA, [the Forest Service] ha[s] determined that Alternative 2 [implementation of the Project] . . . will not have a significant effect on the quality of the human environment considering the context and intensity of impacts." (AR 12225.) Based on this finding, the Forest Service "determined that it is not necessary to prepare an environmental impact statement for the Split Creek Precommercial Thinning Project." (*Id.*).

## 6.    Procedural History

Based upon the Forest Service's conclusion that the Project was "not likely to adversely affect" the lynx or its habitat and that any possible adverse effects of the Project on the lynx and its habitat would be "insignificant," on December 16, 2009, the Forest Service issued a Decision Notice and Finding of No Significant Impact approving implementation of the Project. On January 29, 2010, Plaintiffs filed their administrative appeal with the Forest Service. (AR 12241.) On March 22, 2010, the decision to implement the Project was affirmed and Plaintiffs' requested relief was denied. (AR 12403.)  Precommercial thinning began in July of 2010.

**MEMORANDUM DECISION AND ORDER - 19**

Plaintiffs filed a complaint in this Court on May 11, 2011. (Dkt. 1.) In their

amended complaint, Plaintiffs raise six claims under NEPA, NFMA, and the ESA. (Dkt.

18.) All six claims challenge either the agencies' adoption of the 2005 LAU map or the

authorization of the Split Creek Project itself.[8] The amended complaint seeks various

declarations from this Court that the Forest Service and the FWS violated the ESA,

NEPA, and NFMA by adopting the 2005 map and authorizing the Project. (Dkt. 18 at 33-

34.) Plaintiffs also request that the Court enjoin implementation of the Project and award

costs, expenses, and fees under the Equal Access to Justice Act and the ESA. (Dkt. 18 at

34.)

On August 24, 2011, Plaintiffs filed a motion seeking an order enjoining all

activities authorized by the Project, which were scheduled to recommence on August 23,

2011 – the second year of the Project. (Dkt. 25.) The Court denied the motion, finding

that Plaintiffs had not carried their burden of demonstrating irreparable harm. (Dkt. 24.)

---

[8] Plaintiffs' *First Claim* alleges that the agencies violated the ESA and NEPA by authorizing the 2005 map and the Project without assessing the Project area for critical habitat. (Dkt. 18 at 20.) The *Second Claim* alleges that the agencies' adoption of the 2005 map "violates the ESA and NEPA by removing LAUs and occupied lynx habitat from protection, thereby jeopardizing the survival of the species, and by failing to use the best available science in remapping." (*Id*. at 23.) The *Third Claim* asserts that "[t]he Forest Service's authorization of the remapped LAUs, which changed occupied habitat to linkage habitat, violates NFMA and NEPA." (*Id*. at 25.) The *Fourth Claim* alleges that the Forest Service violated NFMA and NEPA because the Project failed to address the Vegetation Standards contained in the Lynx Management Direction. (*Id*. at 28.) The *Fifth Claim* asserts that the Forest Service violated NFMA and NEPA because the Project failed to comply with Standard ALL S1 contained in the Lynx Management Direction. (*Id*. at 29.) Plaintiffs' final claim alleges that the Forest Service violated NEPA by failing to take a "hard look" at the proposed Project's affects. (*Id*. at 31.)

**MEMORANDUM DECISION AND ORDER - 20**

Specifically, the Court found that Plaintiffs had failed to present evidence of resident lynx within the Project area, and that they failed to present any scientific evidence or quantitative expert testimony indicating that the Project would have an adverse impact on the lynx. (*Id.*)

Plaintiffs filed a motion for summary judgment on November 7, 2011, (Dkt. 45), and Defendants' filed a cross-motion for summary judgment on November 14, 2011. (Dkt. 46.) The motions were fully briefed and the parties presented oral arguments on the motions on February 28, 2012.

## DISCUSSION

### 1.   Standard of Review

Judicial review of final agency decisions under NEPA, NFMA, and the ESA is governed by the Administrative Procedures Act. Under the APA, an agency action must be upheld unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Friends of Earth v. Hintz*, 800 F.2d 822, 830-31 (9th Cir. 1986). To decide if an agency action is arbitrary and capricious, the court must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made. *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001). As long as the agency decision was based on the relevant factors and there is no clear error of judgment, the reviewing court may not overturn the agency's action as arbitrary and capricious. *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987).

MEMORANDUM DECISION AND ORDER - 21

"Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving . . . scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989). Nevertheless, the "presumption of agency expertise may be rebutted if the decisions, even though based on scientific expertise, are not reasoned." *Greenpeace v. NMFS*, 80 F.Supp.2d 1137, 1147 (W.D. Wash. 2000). "Where an agency fails to articulate a rational connection between the facts found and the choice made, the Court may not supply a reasoned basis for the agency's action that the agency itself has not given." *Defenders of Wildlife v. Babbit*, 958 F.Supp. 670, 679 (D.D.C. 1997) (internal quotation marks and citations omitted).

Judicial review under this standard is to be "searching and careful," but remains "narrow," and a court should not substitute it judgment for that of the agency. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993). An agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).

## 2.    Waiver and Exhaustion

Defendants argue that Plaintiffs failed to raise their NEPA claims in their scoping comments or in their administrative appeals, and that Plaintiffs' arguments related to

**MEMORANDUM DECISION AND ORDER - 22**

NEPA have therefore been forfeited under the judicial doctrine of waiver and the statutory requirement that parties exhaust their claims at the administrative level. Plaintiffs disagree and reference various portions of the record where the issues raised here were raised during the administrative process.

It is well-settled that a party challenging an agency's compliance with NEPA must structure its participation in the administrative process to alert the agency to the party's contentions so the agency may give the concerns meaningful consideration. *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011) (finding plaintiff had waived certain arguments because nothing in their comments alerted the agency of their specific concerns). Similarly, 7 U.S.C. § 6912(e) requires that "a person shall exhaust all administrative appeal procedures . . . before the person may bring an action in a court." It is not enough to raise some issues in an administrative appeal: "[C]laims raised at the administrative appeal and in the complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." *Kleissler v. U.S. Forest Serv.*, 183 F.3d 196, 202 (3d Cir. 1999); *see also Forest Gaurdians v. U.S. Forest Serv.*, 641 F.3d 423, 430-31 (10th Cir. 2011) (en banc).

Defendants argue that Plaintiffs failed to raise their claim concerning the adoption of the 2005 LAU map at the administrative level. The record indicates otherwise. In its comments to the proposed Project, Alliance for the Wild Rockies asked that the Forest Service "complete NEPA on the Caribou-Targhee National Forest (CTNF) updated Lynx

Analysis Unit mapping for the Canada Lynx that was done in consultation with US Fish and Wildlife Service (USFWS) in 2005." (AR 3147.) Similarly, Plaintiffs supplied the following comments related to the adoption of the 2005 map in response to the Forest Service's scoping notice:

> "The [Forest Service] deleted the project area from occupied lynx habitat in March of 2005." (AR 3154.)

> "The Split Creek Precommercial Thinning Project cannot be implemented because it will not be consistent with current Forest Plan direction." (*Id.*)

> "The delineation of lynx analysis units (LAUs) on the Targhee Forest has already been completed. Therefore, the proposed 'scoping' for public involvement on this process is post decision, and violates the National Environmental Policy Act." (AR 3155.)

> "The 2005 delineation of LAUs . . . never went through the public involvement process required by NEPA." (*Id.*)

> "The [Forest Service's] attempts to justify the deletion of habitat required for lynx management by applying various unvalidated, unscientific 'criteria' for delineation of lynx habitat cannot escape the NFMA requirements to adhere to Forest Plan direction." (*Id.*)

> "Deletion of portions of the Targhee Forest from the Lynx Amendment require a Forest Plan amendment with the accompanying NEPA requirements of public involvement, and formal Section 7 consultation with the USFWS. Until this is done, precommercial thinning on the Targhee Forest will not only be a Forest Plan violation, but a violation of the ESA as well." (*Id.*)

Similarly, Plaintiffs' administrative appeal states that "[t]he Forest Service will violate NEPA . . . by . . . failing to complete NEPA requirements when making significant changes in the delineation of occupied mapped lynx habitat on the forest," (AR 12250); that "the remapping of lynx habitat to delete many additional areas of the Forest as occupied mapped lynx habitat triggered NEPA," (AR 12259); and that the removal of hundreds of thousands of acres of protected LAUs is "not an insignificant change"; and that "this reduction clearly had the potential to adversely impact lynx in a significant manner, impacts that would trigger both NEPA analysis and Section 7 (ESA) consultation." (AR 12260.)

These statements in the scoping comments and the administrative appeal are more than sufficient to put the Forest Service on notice that Plaintiffs were taking issue with the Forest Service's failure to conduct full NEPA review of the 2005 map. The fact that the word "tiering" does not appear in the scoping comments or the administrative appeal is of no moment; the principle underlying the tiering concept was present – that the Forest Service could not base its EA on the 2005 map without first analyzing the map itself under NEPA. *See Barnes*, 655 F.3d at 1133 (noting that while the agencies might prefer the petitioner to be more detailed in comments, "petitioners need not 'incant [certain] magic words . . . in order to leave the courtroom door open to a challenge.'") (citing *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002)).

Based on the above, the Court finds that Plaintiffs neither forfeited nor failed to exhaust their NEPA claims concerning the adoption of the 2005 map.[9]

**3.     NEPA**

"NEPA is a statute that aims to promote environmentally sensitive governmental decision-making, without prescribing any substantive standards." *Anderson v. Evans*, 371 F.3d 475, 487 (9th Cir. 2004) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989)). The United States Supreme Court has recognized that NEPA was enacted with two purposes in mind, or "twin aims." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). The first of the twin aims "places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (alteration in original) (quoting *Baltimore Gas & Elec. Co.*, 462 U.S. at 97). "Second, [NEPA] ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co.*, 462 U.S. at 97.

Given the above "twin aims," NEPA "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Metcalf v. Daley*,

---

[9] Defendants also argue that Plaintiffs forfeited and/or failed to exhaust their claims that the agency failed to adequately analyze the cumulative effects of the project or discuss past, present or reasonably foreseeable future actions. Because the Court has determined that the case must be remanded to the agency on different grounds, the Court will not address this issue.

**MEMORANDUM DECISION AND ORDER - 26**

214 F.3d 1135, 1141 (9th Cir. 2000). Among these "action-forcing" procedures is the

requirement that federal agencies prepare an EIS prior to taking "major Federal actions

significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Some

proposed federal actions categorically require the preparation of an EIS. If the proposed

action does not categorically require the preparation of an EIS, which is the situation in

this case, the agency must prepare an EA to determine whether the action will have a

significant affect on the environment. *Metcalf*, 214 F.3d at 1142. If the EA determines

that the proposed action will significantly affect the environment, then the agency must

prepare an EIS. If the EA reveals no significant effect, the agency may issue a Finding of

No Significant Impact – or FONSI in NEPA parlance. *See Id.* at 1142; *see also*, 40 C.F.R.

§§ 1501.4, 1508.9.

In reviewing a challenge to the adequacy of an EA, courts apply a "rule of reason"

to determine whether the agency took a "hard look" at a proposed action by preparing a

"reasonably thorough discussion of the significant aspects of probable environmental

consequences." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002)

(internal quotation marks and citations omitted). "[I]f substantial questions are raised

regarding whether the proposed action may have a significant effect upon the human

environment, a decision not to prepare an EIS is unreasonable." *Save the Yaak Committee*

*v. Block*, 840 F.2d 714, 717 (9th Cir. 1998).

In this case, it is undisputed that the Forest Service did not prepare an EIS for

either the 2005 map or the Split Creek Project. That, however, is where the agreement

**MEMORANDUM DECISION AND ORDER - 27**

between the parties ends and the confusion begins. The parties' arguments under NEPA are akin to ships passing in the night, with only the obligatory signal as to the direction they are heading and a distant voice in the darkness. Both parties use the regulations promulgated by the Council on Environmental Quality ("CEQ") as a starting point for their NEPA analyses. The CEQ regulations define the term "significantly" for purposes of NEPA (one of the findings that must be made before an agency is required to prepare an EIS) and require agencies to look at the "context" and the "intensity" of a federal action in determining whether it will have a significant affect on the environment. 40 C.F.R. § 1508.27.

The regulations state that "intensity" "refers to the severity of impact" and set forth ten factors that an agency should consider in evaluating intensity. 40 C.F.R. § 1508.27(b)(1) - (10). Both parties make their arguments under these factors. However, while Plaintiffs repeatedly reference the adoption of the 2005 map as the 'significant action' requiring the preparation of an EIS, Defendants' analysis of the same factors shifts the focus to whether the Project (as opposed to the adoption of the 2005 map) was a significant action requiring preparation of an EIS under NEPA.

Sorting through this confusion, two issues emerge. The first is whether the Forest Service's adoption of the 2005 LAU map is the type of federal action requiring NEPA analysis under the circumstances presented in this case. Assuming that question is answered in the affirmative, the second issue is whether the discussion of the 2005 map in the EA prepared for the Split Creek Project cures any procedural defects related to the

**MEMORANDUM DECISION AND ORDER - 28**

2005 map and the agency's obligations under NEPA.

### A.      *Whether adoption of the 2005 map required NEPA review*

NEPA requires the preparation of an EIS only for "major Federal actions significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(C). In their briefing, Plaintiffs state that "[t]he incorporation of the 2005 Map was not adequately addressed at the project-level; rather, the 2005 Map is a landscape scale remapping that impacts hundreds of thousands of acres of protected Canada lynx habitat that the Forest Service chose to implement without NEPA analysis." (*Pl.s' Reply and Opposition* at 5, Dkt. 50.) Plaintiffs further argue that the adoption of the 2005 map was "a major federal action with significant effects to the Canada lynx and its habitat, and an EIS should have been completed." (*Id.*)

The federal regulations define "major Federal action" as "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. While that definition alone is not considerably instructive, the regulations state that "Federal actions tend to fall within one of [four] categories." The second category is described as the "[a]doption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based." 40 C.F.R. § 1508.18(b)(2).

The Court finds that the adoption of the 2005 map falls nicely within the above definition. The 2005 map was a document officially approved by the Forest Service.

**MEMORANDUM DECISION AND ORDER - 29**

Indeed, the Split Creek Project was originally approved by the Forest Service in December of 2007 and relied on the 2005 map, which had not yet been approved by the Regional Forester. (AR 3028.) However, after receiving objections to the use of a map that had not been exposed to public comment, the Forest Service withdrew the Project in August of 2008 to provide notice and comment on both the 2005 map and the Project. There also seems to be little room for debate over whether the 2005 map ultimately governs "uses of Federal resources, upon which future agency actions will be based." 40 C.F.R. § 1508.18(b)(2). Without the adoption of the 2005 map – and the attendant elimination of nearly 400,000 acres of land within LAUs – the Project area would have been subject to the restrictions contained in the Lynx Management Direction, which prohibits precommercial thinning within LAU boundaries. With the adoption of the 2005 map, the 390,900 acres of previously restricted land was opened for uses that were not available without the adoption of the map.

Defendants skirt the issue of whether the adoption of the 2005 map was a major Federal action. In their cross-motion for summary judgment, Defendants claim that "the 2005 LAU map is not a programmatic management guideline, nor is it a broad program from which future projects will result." (Dkt. 46-2 at 19.) Defendants do not, however, directly claim that the adoption of the 2005 map did not constitute a federal action requiring NEPA analysis. In the same paragraph, Defendants retort that "[t]he EA clearly summarizes the changes to the map and provides information that led to the 2005 LAU map." (Dkt. 46-2 at 19.) This statement seemingly suggests that the map was subject to

MEMORANDUM DECISION AND ORDER - 30

NEPA review and, in Defendants' view, the EA satisfied the Forest Service's NEPA obligations regarding the 2005 map.

Plaintiffs cite *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062, 1066 (9th Cir. 2002), in support of their argument that an EIS should have been prepared for the 2005 map. The Court agrees that *Kern* is relevant here and will now turn to a discussion of that case.

In *Kern v. U.S. Bureau of Land Management*, environmentalists brought an action against the Bureau of Land Management ("BLM") challenging an EIS prepared for a resource management plan governing timber sales on the Oregon Coast. 284 F.3d at 1066. The plaintiffs in that case, like Plaintiffs here, argued that the EIS was inadequate under NEPA because the EIS referred to certain earlier adopted guidelines (governing the management of a pathogenic root fungus) that had not themselves been subjected to NEPA review. *Id*. at 1068.

The plaintiffs in *Kern* argued that the reference in the EIS to the guidelines, which had not been analyzed under NEPA, constituted illegal "tiering." *Id*. at 1073. Tiering refers to the process whereby an agency is allowed to reference an earlier agency decision or policy when assessing the environmental impacts of a smaller project under NEPA without going into a full-blown discussion of the earlier decision. NEPA regulations encourage agencies to tier their environmental impact statements to "eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. 1502.20. Through this tiering process, an

**MEMORANDUM DECISION AND ORDER - 31**

agency need not discuss the impacts of a broader agency policy or decision in an assessment of a smaller agency action, even if it falls under the umbrella of the more global policy. This paper-saving policy, however, applies only when the broader decision already has been subject to NEPA review. *Id.* at 1173. Indeed, in *Kern*, the Ninth Circuit stated that "tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA." *Id.*

The odd aspect of *Kern*, however, was that the guidelines already had been challenged in federal court and the Ninth Circuit previously had held that the guidelines – at the time they were adopted – were not subject to NEPA review. *See Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660 (9th Cir. 1998)). In that case, the same plaintiffs as those in the *Kern* case filed suit alleging that the guidelines should have been analyzed under NEPA and that an EIS should have been prepared. *Northcoast Envtl, Ctr.*, 136 F.3d at 662. The Ninth Circuit disagreed, holding that the guidelines did not constitute a major federal action under NEPA. *Id*. at 665. The crux of the court's holding was that the guidelines were primarily preliminary research and development efforts – they "neither propose any site-specific activity nor do they call for specific actions directly impacting the physical environment." *Id*. at 670. The circuit court did note, however, that although the guidelines in and of themselves did not need to be analyzed under NEPA, if they were incorporated into a specific agency action they would be subject to NEPA in the context of that action. *Id*. The court stated:

**MEMORANDUM DECISION AND ORDER - 32**

> There is no reason plaintiffs cannot challenge the sufficiency of an agency EIS when a discrete agency action is called for. The agencies will be unable to shield their . . . program from NEPA review because they will not be able to avail themselves of the Council on Environmental Quality's "tiering" provision." [citation omitted]. . . . Furthermore, the Secretaries have stated their intentions to prepare an EIS when they propose to implement particular control strategies with environmental impacts. As we stated in [*Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346 (9th Cir. 1994), judicial estoppel will prevent the Secretaries from arguing they have no further duty to consider their . . . management policies when sitespecific programs are challenged. [citation omitted]. "We assume that government agencies will . . . comply with their NEPA obligations in later stages of development." *Id*. at 1358.

*Northcoast Envtl, Ctr.*, 136 F.3d at 6770.

Based upon the above referenced statements in *Northcoast*, the court in *Kern* held that, while the guidelines may not have been subject to NEPA review at the time they were created, the agency could not reference the guidelines in a site-specific EIS without first analyzing the guidelines under NEPA; such an action, the court held, constituted illegal tiering. *Kern*, 284 F.3d at 1073.

Here, Plaintiffs argue that the authorization of the Split Creek Project (which the Forest Service assessed in an EA under NEPA) based upon the 2005 map (which was not analyzed under NEPA) constitutes improper tiering. This argument is simply a reiteration of Plaintiffs' main contention that the agencies should have conducted an EIS for the adoption of the 2005 map prior to using the revised map as a basis for approving the Project. Defendants contend that this argument is a red herring. They claim that, unlike

**MEMORANDUM DECISION AND ORDER - 33**

the guidelines at issue in *Kern*, the 2005 map is not a programmatic management guideline, nor is it a broad program from which future projects will result.

The Court agrees with Plaintiffs and finds that the 2005 map should have been analyzed under NEPA in this case. Regardless of whether the 2005 map needed to be analyzed under NEPA at the time it was adopted,[10] under *Kern* the Forest Service was required to conduct NEPA review of the 2005 map before using the map as a basis for approving the Split Creek Project. The 2005 map removed eight LAUs from the 2001 map. It eliminated almost 400,000 acres of land that was previously subject to greater environmental restrictions under the Lynx Management Direction. It opened nearly 400,000 acres of land to precommercial thinning projects – projects that would be prohibited under the earlier map and the restrictions applicable to LAUs. Although the 2005 map was subjected to public comment prior to the approval of the Project, the map was never subjected to independent NEPA review, which would have required an analysis of the potential affects the removal of the LAUs would have on the lynx, its habitat, and the habitat of the snowshoe hare. Such analysis is absent in this case. The absence of such analysis violates NEPA's procedural requirements and the Ninth Circuit's decision in *Kern*.

---

[10] The Court does not decide the question of whether the 2005 map should have been subjected to NEPA review at the time it was adopted. In other words, the issue in *Northcoast* is not before the Court. *Kern* governs this case and a NEPA analysis of the 2005 map was required before it could be used as a basis for approving the Project.

**MEMORANDUM DECISION AND ORDER - 34**

### B. *Discussion of the 2005 map in the EA prepared for the Project*

The second issue related to the parties' NEPA arguments is whether the discussion of the 2005 map in the EA prepared for the Project cured any procedural defects related to the 2005 map and the agency's obligations under NEPA. The Court answers this question in the negative – the discussion of the 2005 map in the EA did not satisfy the Forest Service's obligations under NEPA.

### (1)   Factors for determining whether an action is significant

NEPA regulations list ten factors for determining whether an action is significant and therefore triggers the need for an EIS. 40 C.F.R. § 1508.27. Because the agencies' authorization of the Project is dependent upon the propriety of the adoption of the 2005 map, the factors related to the 2005 map will be discussed below.

### (a)   *Significance may be triggered if the geographic area has unique characteristics. 40 C.F.R. 1508.27(b)(3)*

The regulations list park lands, prime farmlands, wetlands, wild and scenic rivers, and ecologically critical areas as non-exclusive examples of areas demonstrating unique characteristics. 40 C.F.R. 1508.27(b)(3). The geographic area in this case is national Forest land, much of which was previously deemed within the boundaries of LAUs and protected lynx habitat under the Lynx Management Direction. In their response to Plaintiffs' argument on this factor, Defendants argue that "[t]he Caribou-Targhee National Forest (CTNF) has not designated critical habitat for lynx [and] [t]he Project area is not within an LAU." (*Def.s' Mem. In Support of Cross-Mot. For Summ. J.* at 10,

Dkt. 46-2.) This argument misses the point. If the adoption of the 2005 map and the elimination of LAUs in the Project area was procedurally improper, the EA cannot withstand judicial review. Under the Lynx Management Direction and the Forest Plan, which incorporates the vegetation standards contained in the Lynx Management Direction, the land within the boundaries of LAUs is subject to various environmental restrictions. By definition, LAUs have unique characteristics. The Court finds that this factor weighs in favor of a finding of significance, which would require the preparation of an EIS.

> **(b)**    *An action may be significant if it is likely to be highly controversial. 40 C.F.R. 1508.27(b)(4)*

The fact that members of the public disagree with a project does not in itself make the project highly controversial for the purposes of the federal regulations. A proposed action is "highly controversial," when there is "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a [project]." *Anderson v. Evans*, 314 F.3d 1006, 1018 (9th Cir. 2002).  The Forest Service explains that there are no highly controversial effects of the Project because of its limited context, size and location. Again, Defendants shift focus to the Project rather than to the adoption of the 2005 map. As Plaintiffs suggest, this ignores the removal of hundreds of thousands of acres of threatened species habitat from management protection.

The Court finds that there is a substantial dispute about the nature and effect of the adoption of the 2005 map and the attendant elimination of LAUs within the Project area.

**MEMORANDUM DECISION AND ORDER - 36**

Defendants contend that the adoption of the 2005 map was basically administrative in nature and that it was authorized by (and done in accordance with) Standard LAU S1 contained in the Lynx Management Direction, which states that "[c]hanges in LAU boundaries shall be based on site-specific habitat information and after review by the Forest Service Regional Office." (AR 1576.) Plaintiffs place much more significance on the nature of the Forest Service's decision to radically change the boundaries of LAUs within the C-TNF. The dispute over the nature and affect of the 2005 map is highly controversial, supporting a finding of significance under 40 C.F.R. 1508.27(b)(4).

     **(c)**    ***An action may be significant if the effects on the environment are highly uncertain or involve unique or unknown risks. 40 C.F.R. 1508.27(b)(5)***

Plaintiffs assert that "research and literature on the ecology of lynx in the southern portion of its range is sparse." (Dkt. 45-2 at 7) (citing AR 12226). Plaintiffs further represent that, "[b]ecause little is known about this imperiled species, conservation guidelines detailed in the LCAS are 'decidedly conservative, especially with respect to timber management, and are applied broadly to cover all habitats thought to be of possible value to lynx and hare.'" (*Id.*) (quoting from the record at AR 13150-13151).

Defendants argue that, "[w]hile Plaintiffs are correct in stating that the Lynx Conservation Assessment Strategy (LCAS) committed to a more conservative management approach in some aspects of lynx management, [AR] 4588, the LCAS was clear in stating when additional information became available, the LCAS should be amended to reflect a more appropriate approach." (Dkt. 46-2 at 13.) Defendants further

**MEMORANDUM DECISION AND ORDER - 37**

argue that, "[s]ince the LCAS was issued in 2000, specific habitat information was gathered through both habitat and presence surveys, which permitted refinement of the LAU map." (*Id.*)

While the development of new data may lessen the uncertainty of the impacts of a project under 40 C.F.R. 1508.27(b)(5), such development also weighs in favor of NEPA analysis so that the new data can be subjected to peer review and public comment. Without those procedural safeguards, the value of any new data is limited. As Plaintiffs suggest, the elimination of nearly 400,000 acres of land previously protected under the restrictions applicable to LAUs is out of step with the conservative approach adopted by the agencies in the LCAS as well as the standards set forth in the Lynx Management Direction.

> **(d)** *Significance may be triggered if the action might establish a precedent for future actions or represent a decision in principle about a future consideration. 40 C.F.R. 1508.27(b)(6).*

For the significance factor set out in 40 C.F.R. 1508.27(b)(6) to exist, the agency action "must establish a precedent for future actions with significant effects or represent[] a decision in principle about a future consideration."

Plaintiffs state that, "[w]hile the Split Creek Project is limited to 7,000 acres of precommercial thinning, this is merely the first site-specific implementation of the landscape-scale remapping of LAUs on the Forest."[11] (Dkt. 45-2 at 8.) Plaintiffs also

---

[11] Plaintiffs make this argument under a different factor, 40 C.F.R. 1508.27(b)(7), which states that significance exists if it is reasonable to anticipate a cumulatively

MEMORANDUM DECISION AND ORDER - 38

argue that "[t]he several hundred thousand acres removed from LAUs, acres that were previously protected from precommercial thinning, will now similarly be open to thinning and logging." (*Id*.) Defendants contend that Plaintiffs have not, in fact, identified any additional future actions for which the EA establishes a precedent. (Dkt. 46-2 at 14.)

The Court finds that this factor also weighs in favor of a finding of significance. The Court agrees with Defendants that the EA for the Project does not necessarily establish a precedent. But this argument misses the point by shifting the focus from the adoption of the 2005 map to the authorization of the Project itself. The adoption of the 2005 map opened nearly 400,000 acres of land to precommercial thinning. The fact that no other precommercial thinning projects have been identified does not diminish the fact that the adoption of the 2005 map "represents a decision in principle" about the future use of the land within the C-TNF. This factor weighs in favor of a finding of significance.

> **(e)**    ***An action may be significant if it may adversely affect an endangered or threatened species or its habitat that has been designated critical. 40 C.F.R. § 1508.27(b)(9)***

Under the ESA, when a species is listed as threatened, the FWS is required to "designate any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3).  As indicated above, the FWS listed the lynx as threatened in 2000. The agency did not, however, designate critical habitat for the lynx as required by the ESA.  This failure was challenged in federal court, and resulted in a court order requiring

---

significant impact on the environment. Plaintiffs' argument, however, fits better under the "precedent for future actions" factor.

**MEMORANDUM DECISION AND ORDER - 39**

the FWS to "undertake prompt rulemaking to designate [l]ynx critical habitat." *Defenders*

*of Wildlife v. Norton*, 239 F. Supp. 2d 9, 26 (Dist. D.C. 2002).  Following the FWS's

attempt to comply with the order, and more legal challenges, the FWS published its final

revised critical habitat designation for the lynx on February 25, 2009.  *See Alliance For*

*the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126, 1129 (Dist. Mont. 2010.)  The revised

rule designated five units, encompassing approximately 39,000 square miles as critical

habitat.  Unit three includes a small part of Northeastern Idaho in Boundary County.  The

remaining units are located in Maine, Minnesota, Washington, Wyoming, and Montana.

The Project, which is located in Southeast Idaho, is not located within any lynx habitat

designated critical by the Fish and Wildlife Service.

Plaintiffs accurately point out that the FWS's final revised rule was successfully

challenged in *Alliance For the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126 (Dist. Mont.

2010).  In that case, the Alliance (and three other environmental groups) challenged the

FWS's failure to designate critical habitat in certain national forests in Montana and

Idaho, including the Beaverhead-Deerlodge, Bitterroot, Helena, and Lolo National

Forests in Montana, and the Clearwater and Nez Perce National Forests in Idaho. The

Alliance argued that the FWS's reliance on the absence of evidence of reproduction of

lynx in the relevant forests was arbitrary and constituted error.  The court agreed, stating

that the "Service arbitrarily treated evidence of reproduction as a litmus test rather than as

a relevant factor to consider if the challenged national forests in Montana and Idaho

contain the primary constituent element [referring to the biological characteristics that

**MEMORANDUM DECISION AND ORDER - 40**

define lynx habitat].” *Id*. at 1135.  The court ordered the FWS to consider the physical and biological features of the occupied areas to determine whether they should be designated as critical habitat under the ESA, but also concluded that the agency's final rule would stay in effect “while the Service revisits the issue.” *Id*. at 1135, 1145. The FWS has not issued a revised rule. Thus, Defendants are correct that there is no land in the C-TNF that has been designated “critical” by the FWS. (AR 5541-42.)

Plaintiffs argue that the Split Creek Project area and the LAUs abandoned in the 2005 map meet the criteria for critical habitat. That issue, however, is not before the Court. To the extent Plaintiffs speculate that the revised final rule mandated by the *Lyder* decision may result in the designation of critical habitat in the C-TNF, the Court finds that it is unnecessary to engage in this discussion given the Court's holding that the Forest Service illegally tiered the Split Creek Project EA to the 2005 map.

> **(f)** ***An action may be significant if it threatens a violation of Federal, State, or local law. 40 C.F.R. § 1508.27(b)(10)***

Plaintiffs argue that the Forest Service's failure to prepare an EIS for the adoption of the 2005 map under NEPA also resulted in violation of the ESA and NFMA. For instance, Plaintiffs argue that the Biological Opinion prepared pursuant to the ESA was not based upon the “best available science” because the document relies upon the 2005 map and justifies the finding that the Project is “not likely to adversely affect” the lynx or its habitat based on the fact that no LAUs exist in the Project area. Similarly, Plaintiffs assert that the failure to apply the vegetation standards contained in the Lynx

**MEMORANDUM DECISION AND ORDER - 41**

Management Direction (and the Forest Plan) violated NFMA. These are legitimate concerns. As discussed more fully below, the Court agrees with Plaintiffs that the failure to analyze the 2005 map under NEPA undermines the Forest Service's decision under the ESA. And, although the Court does not reach Plaintiffs' claims under NFMA, the danger that the Project does not comply with the Forest Plan is a real one. For these reasons, the Court finds that this factor supports a finding of significance under 40 C.F.R. § 1508.27(b)(10).

C.   *Summary of NEPA analysis*

Concerning Plaintiffs' NEPA claims, the Court finds as follows. First, the Court finds that the Forest Service's use of the 2005 map in the EA for the Split Creek Project without first reviewing the 2005 map under NEPA constituted illegal tiering under *Kern*. Second, the Court finds that the majority of the factors contained in 40 C.F.R. § 1508.27 support a finding of significance, which would require the agency to prepare an EIS. Based upon these findings, the Court holds that the Forest Service did not take the requisite "hard look" at the 2005 map as contemplated by NEPA. The Forest Service's reliance on the 2005 map in the EA (and the subsequent issuance of a FONSI) was a clear error of judgment. *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987). The authorization of the Split Creek Precommercial Thinning Project will be enjoined and the case will be resubmitted to the Forest Service for further NEPA analysis consistent with this decision.

**MEMORANDUM DECISION AND ORDER - 42**

4.    **ESA Claims**

Section 7(a)(2) of the ESA states that "[e]ach Federal agency *shall*, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2) (emphasis added). The consultation between the agencies and a written decision of the FWS concerning whether an action will adversely affect a listed species or critical habitat is mandatory under the ESA.

Here, the Forest Service consulted with the FWS pursuant to Section 7(a)(2) of the ESA to assess the impacts of the Split Creek Project on the lynx and its habitat. The Forest Service, in a Biological Assessment, concluded that although the Project "may affect" the lynx, it was "not likely to adversely affect" the lynx or its habitat. The Forest Service then presented this determination to the FWS, the agency charged with implementing the ESA, and the FWS concurred with the Forest Service's findings.

Plaintiffs argue that approval of the Project violated the ESA for three reasons. First, Plaintiffs argue that the decision to adopt the 2005 map and the finding that the Project was not likely to adversely affect the lynx or its habitat were not based upon the best available science. Second, Plaintiffs argue that the Project area contains critical habitat and that the agencies' contrary conclusion is arbitrary and violates the ESA. Third, Plaintiffs argue that the agencies' failure to make a jeopardy determination for the 2005

**MEMORANDUM DECISION AND ORDER - 43**

map violated the ESA. Plaintiffs' third argument is addressed below.[12]

As noted above, Section 7 of the ESA requires the Forest Service, in consultation with FWS, to make a finding as to whether an agency action is likely to jeopardize the continued existence of any listed endangered or threatened species or result in the destruction or adverse modification of the designated critical habitat of the species. 16 U.S.C. § 1536(a)(2). "Agency action" is interpreted broadly, *see TVA v. Hill*, 437 U.S. 153, 173 n. 18 (1978), and "the ESA requires the biological opinion to analyze the effect of the entire agency action." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988).

Here, Plaintiffs assert that there was no determination regarding whether the adoption of the 2005 map and the removal of approximately 400,000 acres of land previously designated as LAUs would jeopardize the continued existence of the lynx. Defendants direct the Court to a biological opinion from 2007 on the potential affects of the standards and guidelines contained in the Lynx Management Direction. (AR FWS 208.) The biological opinion concludes that the adoption of the standards and guidelines contained in the Lynx Management Direction are "not likely to jeopardize the continued

---

[12] The Court is not in a position to rule on Plaintiffs' first two arguments under the ESA. As outlined above, the question related to the propriety of the FWS's designation of critical habitat (or lack thereof in the C-TNF) is not properly before the Court. Similarly, given the procedural irregularities related to the adoption of the 2005 map, the Court is not in a position to rule on the question of whether the best available science was used in adopting the map and approving the Project. The 2005 map may very well be based upon the best available science. However, without the benefit of the procedural safeguards under NEPA and the requisite jeopardy determination under the ESA, the Court cannot approve the use of the 2005 map.

**MEMORANDUM DECISION AND ORDER - 44**

existence of lynx within the contiguous United States." (*Id*. at 282.)

Defendants argue that, because a jeopardy determination was made for the standards contained in the Lynx Management Direction, and those standards were used in revising the LAU map in 2005, the agencies satisfied their obligations under the ESA. The Court does not agree.

The biological opinion from 2007 does not assess the validity of the 2005 map and nothing in the record demonstrates that the FWS ever made a decision concerning whether the adoption of the 2005 map would jeopardize the lynx. The record demonstrates that the FWS concluded that the adoption of the standards and guidelines contained in the Lynx Management Direction warranted consultation and a jeopardy determination under the ESA. Similarly, the Biological Assessment prepared for the Split Creek Project concluded that the Project "may affect" but was "not likely to adversely affect" the lynx or its habitat. But the agencies skipped a step. That step should have been an evaluation of whether the implementation of the guidelines from the Lynx Management Direction and the elimination of 390,900 acres of land within the boundaries of LAUs in the 2005 map would adversely affect the lynx or its habitat. The failure to assess whether the adoption of the 2005 map would jeopardize the lynx or its habitat violated the ESA.

## 5.    Remedies

The Administrative Procedure Act directs that a court "shall . . . set aside" any agency action found to be "arbitrary capricious, . . . or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). The Supreme Court has held that vacatur is the presumptive

remedy for this type of violation. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25

(1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set

aside the agency's action and remand the case."). Having found violations of NEPA and

the ESA,[13] the Court concludes that remand is the appropriate remedy in this case. *See*

*Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1034-35 (D.C. Cir. 2008). Further,

given the above disposition, the Split Creek Project will be enjoined until the agencies

satisfy their obligations under NEPA and the ESA. *See Lands Council v. Powell*, 395 F.3d

1019, 1037 (9th Cir. 2005).

Defendants argue that, even if the Court finds a violation under NEPA or the ESA,

"Plaintiffs would not be entitled to any injunctive relief." (Dkt. 46-2 at 30.) The Court

disagrees. The Court has determined that the EA and the Finding of No Significant

Impact under NEPA were procedurally defective because they relied upon a document

that itself should have been, but was not, vetted under NEPA. The Court also has

determined that the FWS should have made a jeopardy determination for the 2005 map.

These decisions by the Forest Service and the FWS were the basis for the authorization of

---

[13] Plaintiffs also raise a claim under the National Forest Management Act. 16 U.S.C. § 1600 *et seq*. Plaintiffs' argument is rather straight forward: if the 2005 map is invalid due to the agencies' failure to conduct the proper analysis under NEPA, then the 2001 map, which delineated LAUs within the project area remained in effect, and the Forest Service violated NFMA by not following the vegetation standards contained in the Lynx Management Direction and applicable to LAUs. Given the Court's rulings on the NEPA and ESA claims, the Court will not address the alleged violations of NFMA.

**MEMORANDUM DECISION AND ORDER - 46**

the Project. And there can be no dispute that the Project itself is altering the physical landscape by removing trees on land that was previously subject to restrictions for the benefit of a protected species under the ESA. In the absence of a valid FONSI and biological assessment, the Court fails to grasp how the Project can continue.

Notwithstanding the Court's puzzlement concerning Defendants' argument in this regard, because the injunction is an important aspect of Plaintiffs' requested relief and the Court's order, the Court will briefly consider the factors required for an injunction.

The standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits rather than a likelihood of success. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n. 12 (1987). To obtain injunctive relief, the plaintiff must demonstrate: (1) success on the merits; (2) likelihood of irreparable harm absent injunctive relief; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by an injunction. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008) (setting forth the factors for preliminary injunctive relief).

Here, through this order, Plaintiffs have demonstrated success on the merits of their NEPA and ESA claims. Concerning the second factor, the Ninth Circuit has stated, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages . . . i.e., [it is] irreparable." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033-1034 (9th Cir. 2007). Defendants argue that nothing has changed since the Court denied

**MEMORANDUM DECISION AND ORDER - 47**

Plaintiffs' request for a preliminary injunction, which specifically found that Plaintiffs had failed to make a showing of irreparable injury.

The Court sees things a bit differently. The focus during the preliminary injunction proceedings was on potential harm to the lynx and its critical habitat under the legal framework of the ESA.  When denying Plaintiffs' motion, the Court stated that, "while the record indicates . . . some historic presence [of the lynx] within the boundary of the Caribou-Targhee National Forest, Plaintiffs have presented no evidence of the lynx's occupancy within the Project area." (Dkt. at 24.) It also was (and remains) undisputed that the FWS has not designated any critical habitat for the lynx within the Project area.

Plaintiffs chose not to focus on their NEPA claims in their motion for preliminary injunction. Indeed, Plaintiffs state as much in their reply brief: "Plaintiffs did not discuss NEPA violations at length in their Brief for a preliminary injunction due to space limitations and because they chose to prioritize ESA claims due to the lessened standards for preliminary injunctions under the ESA." (*Pl.s' Reply to Def.s' Brief in Opp.*, at 6, Dkt. 32.) Plaintiffs also noted, however, that they "intend[ed] to fully brief their NEPA arguments in their summary judgment briefing." (*Id.*) Plaintiffs fulfilled their intention, and the Court has found that the agencies did not comply with NEPA when they approved the Project based upon the un-vetted 2005 LAU map. The irreparable injury in this case is the alteration of land that was (and perhaps should remain) subject to environmental restrictions applicable to LAUs.

**MEMORANDUM DECISION AND ORDER - 48**

Finally, the Court finds that an equitable remedy is warranted in this case and is supported by the public interest. *See National Wildlife Federation v. National Marine Fisheries Service*, 235 F.Supp.2d 1143, 1162 (W.D. Wash. 2002) ("ensuring that government agencies comply with the law is a public interest of the 'highest order.'") (quoting *Seattle Audubon Soc'y v. Evans*, 771 F.Supp. 1081, 1096 (W.D. Wash. 1991)).

**<u>ORDER</u>**

Based on the foregoing, the Court being otherwise fully advised in the premises, IT IS HEREBY ORDERED that:

1.      Plaintiffs' Motion for Summary Judgment (Dkt. 45) is GRANTED IN PART AND DENIED IN PART in accordance with this decision.

2.      Defendants' Cross-Motion for Summary Judgment (Dkt. 46) is DENIED.

3.      The Decision Notice & Finding of No Significant Impact is hereby remanded to the Forest Service for further evaluation under NEPA consistent with this decision.

4.      The "Biological Assessment for the Canada Lynx (Lynx canadensis) for Split Creek Precommercial Thinning Project" dated July 22, 2009, and the Fish and Wildlife Service's concurrence with the Forest Service's assessment are hereby remanded to those agencies for further consideration consistent with this decision.

**MEMORANDUM DECISION AND ORDER - 49**

5.      The Split Creek Precommercial Thinning Project is hereby enjoined.



DATED: June 6, 2012

Honorable Candy W. Dale
Chief United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 50**